Gloria A. NICHOLS, as personal representative of the Estate of David R. Nichols, Jr.; Gloria A. Nichols; David R. Nichols,

v.

John D. ESTABROOK, M.D.; John D. Estabrook, M.D., P.A.

Civ. No. 87–430–D.

United States District Court, D. New Hampshire.

June 21, 1989.

Harvey J. Garod, Ossipee, N.H., for plaintiffs.

Lawrence E. Spellman, Concord, N.H., for defendants.

## ORDER

DEVINE, Chief Judge.

This medical malpractice suit arises from the tragic death of sixteen-week-old David R. Nichols, Jr. The decedent's parents[1] seek $2,000,000 in damages from Dr. John D. Estabrook, the physician who examined their son shortly before his death. Relevant facts derived from the complaint and plaintiffs' depositions follow.

At approximately 1:30 a.m. on October 23, 1986, Gloria and David Nichols brought their son to the Wentworth–Douglass Hospital emergency room. The baby had been vomiting and was suffering from diarrhea. Dr. John Estabrook examined the baby and determined that he was suffering from dehydration and the flu or a virus. A blood sample was taken; the doctor reviewed the results, found nothing abnormal, and told plaintiffs that their baby "was going to be okay." Deposition of Gloria A. Nichols, October 19, 1988, at 37. Dr. Estabrook contacted the Nicholses' family pediatrician in Rochester, New Hampshire. He then advised the Nicholses to take the baby to Frisbie Memorial Hospital where the pediatrician, Dr. Roy, would be waiting. The Nicholses asked Dr. Estabrook for an ambulance and were told, "if it was an emergency and it was serious we would have one, but it was nothing serious, that he was going to be okay." *Id.* at 40.

The Nicholses drove the fifteen minutes to Frisbie Memorial Hospital, where a pediatrics unit nurse saw them. As soon as the nurse saw the baby, "[s]he picked him right up and started slapping him in the face, and she called a code, and started hollering for a doctor." Deposition of David R. Nichols, March 11, 1988, at 55–56. Dr. Roy arrived thirty-five or forty minutes later. Although Dr. Estabrook had advised him that "the blood work was good", *id.* at 57, Dr. Roy later explained "that when he got the blood test, it was really bad, and that [Dr. Estabrook] should have started an I.V. right then, up there, and it didn't matter whether the baby got transferred." *Id.* at 58. David Nichols, Jr., died approximately forty-five minutes after arriving at Frisbie Memorial Hospital.

On November 9, 1987, the Nicholses filed this civil action. Presently before the Court is defendants' motion to dismiss in part and for partial summary judgment.[2]

---

1. Gloria A. Nichols sues in two capacities: (1) as the personal representative of her son's estate and (2) as an individual. David R. Nichols, decedent's father, sues in his individual capacity.

2. Because matters outside the pleadings have been presented, the Court reviews defendants' motion according to Rule 56, Fed.R.Civ.P., applying the standard for summary judgment. *See* Rule 12(b), Fed.R.Civ.P.; *Moody v. Town of Weymouth,* 805 F.2d 30, 31 (1st Cir.1986);

## 1. Emotional Distress

■ Count II of the First Amended Complaint contains plaintiffs' claim for damages as compensation for their "grievous emotional distress, pain, anguish and suffering." Complaint at 6, ¶ 22(a). Defendants move to dismiss this claim, arguing that plaintiffs' emotional distress is not accompanied by any physical injury as required by *Corso v. Merrill*, 119 N.H. 647, 406 A.2d 300 (1979), and its progeny.

In *Corso*, the New Hampshire Supreme Court held "that a mother and father who witness or contemporaneously sensorially perceive a serious injury to their child may recover if they suffer serious mental and emotional harm that is accompanied by objective physical symptoms." *Id.* at 659, 406 A.2d 300. Under the rule of *Corso*, recovery is not permitted for "mere upset, dismay, humiliation, grief and anger." *Id.* at 652–53, 406 A.2d 300 (quoting Comment, *Negligence and the Infliction of Emotional Harm: A Reappraisal of the Nervous Shock Cases*, 35 U.Chi.L.Rev. 512, 517 (1968)). Instead, the emotional harm "must be a painful mental experience with lasting effects." *Corso*, at 653, 406 A.2d 300. And, as the *Corso* court made clear, "the harm for which plaintiff seeks to recover must be susceptible to some form of objective medical determination and proved through qualified medical witnesses." *Id.* See also *Siciliano v. Capitol City Shows, Inc.*, 124 N.H. 719, 727, 475 A.2d 19, 23 (1984), *and Wilder v. City of Keene*, 131 N.H. 599, 603, 557 A.2d 636, 638 (N.H. 1989).

Plaintiffs here make no claim that their emotional distress has taken physical form.[3] Instead, they argue that their emotional injuries are not "minor or insignificant", Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss in Part and For Partial Summary Judgment

at 3, and submit as evidence of those injuries an affidavit prepared by their counsel which states in relevant part "[t]hat during the said deposition, Gloria A. Nichols broke down several times, requiring one recess (p. 26) and suspension of the deposition shortly after it had begun." Affidavit of Attorney Harvey J. Garod at ¶ 4. However, severe emotional distress does not, by itself, establish a claim for legal relief. To prevail under New Hampshire law, plaintiff must present medical verification. Plaintiffs here have submitted no medical evidence to support their claim.

Plaintiffs' reliance on *MacLean v. Sperry*, No. 83–734–L, slip op. (D.N.H. Apr. 8, 1988) (Loughlin, J.), is misplaced. The *MacLean* case presented evidence of devastating physical and emotional injury. Beyond question, plaintiffs here have suffered serious emotional distress. They have not, however, presented evidence of the required physical injury. *See Nutter v. Frisbie Memorial Hosp.*, 124 N.H. 791, 796, 474 A.2d 584, 587 (1984) ("pain at the death, illness or injury of a loved one is an emotional cost borne by everyone living in society"). Accordingly, plaintiffs' claim for damages based on their own emotional distress must be and herewith is dismissed.

## 2. Lost Services

■ In Count II, plaintiffs also pursue damages based on the lost services of their child. First Amended Complaint ¶ 22(b). As defendants correctly note, New Hampshire law does not permit parents to recover for intangible injuries resulting from the loss of a child's services. *Siciliano, supra*, 124 N.H. at 728, 475 A.2d at 24. Parents have the right to recover pecuniary damages for the loss of a child's services; that right, however, is extinguished on the child's death. *Siciliano, supra*, 124 N.H.

*Greenberg v. Mynczywor*, 667 F.Supp. 901, 905–06 (D.N.H.1987).

**3.** The only evidence on point indicates that no such physical injury is manifest. At his March 11, 1988, deposition, plaintiff David Nichols testified as follows:
> Q: You were asked, "Do you claim that you have had to seek medical, psychological, chiropractic or other treatment as a result of the baby's death," and you answered, no. Is that still true?
> A: Yes.
> Q: We asked the same question of Gloria and she answered, no. Is it still true for Gloria?
> A: Yes.

Transcript at 69.

at 731, 475 A.2d at 26 (1984) (Douglas, J., dissenting); *Chaloux v. International Paper Co.*, 75 N.H. 281, 285, 73 A. 301, 303 (1909). *See also Beaudoin v. Beaudoin*, 118 N.H. 325, 327, 386 A.2d 1261, 1263 (1978) (parents are entitled to services and earnings of minor children only as long as parents retain custody and support minor children); *Lessard v. Company*, 83 N.H. 576, 578, 145 A. 782, 784 (1929); *Hillsborough v. Deering*, 4 N.H. 86, 95 (1827). Here, the allegedly negligent conduct occurred only hours before the sixteen-week-old decedent's death. Defendant accordingly moves for summary judgment, asserting that no pecuniary services could have been rendered in that short period. To defeat defendants' motion, plaintiffs must present evidence sufficient to establish a genuine issue of material fact; that is, "whether there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *DeArteaga v. Pall Ultrafine Filtration Corp.*, 862 F.2d 940, 941 (1st Cir.1988).

■ Plaintiffs here have presented no evidence to counter defendants' attack on their claim for the loss of their child's pecuniary services. Plaintiffs hope to save this claim by arguing that they are entitled to nominal damages for the loss of their son's services. The Court cannot agree.

Nominal damages are rarely available in personal injury actions. 22 Am.Jur.2d 47, *Damages* § 19 (1988). Although nominal damages may be awarded as compensation for injuries to property, *see, e.g., Pugliese v. Town of Northwood*, 119 N.H. 743, 751, 408 A.2d 113, 118 (1979); *Blodgett v. Stone*, 60 N.H. 167 (1880), personal injury actions must result in more than merely nominal damages to support recovery. *Rowe v. John Deere*, 130 N.H. 18, 21, 533 A.2d 375 (1987); *White v. Schnoebelen*, 91 N.H. 273, 274–75, 18 A.2d 185, 186 (1941); *Trudeau v. Company*, 89 N.H. 83, 84, 192 A. 491, 491–92 (1937) ("Nominal damages have no place in actions of this sort.").[4] Summary judgment is therefore granted as to plaintiffs' claim for loss of their child's services.

*3. Hedonic Damages*

■ Defendants also move to dismiss plaintiffs' claim for "hedonic damages". First Amended Complaint ¶ 18(e).[5] New Hampshire Revised Statutes Annotated ("RSA") 556:12 specifies the elements of damages recoverable in a wrongful death action.[6] Although hedonic damages are not contained within that list, the statute provides that the specified damages "may be considered as elements of damage in connection with other elements allowed by law, in the same manner as if the deceased had survived." Thus, if hedonic damages are "allowed by law", they would be available to plaintiffs here. However, the New

---

4. *Woods v. United States*, 197 F.Supp. 841 (E.D. N.Y.1961), does not require a different result. In that case, seven-year-old Catherine Woods was hit by a postal service truck. Judgment was rendered for Catherine in the amount of $3,000. In addition, Catherine's father was awarded $621.30, the amount he paid for Catherine's medical bills. Only one sentence addresses the issue of nominal damages: "In my opinion the damages claimed by plaintiff Robert Woods for the loss of companionship of his infant daughter are purely nominal." *Id.* at 844. No nominal damages, however, were awarded.

5. The term "hedonic" derives from the Greek word for pleasure. Webster's Third New International Dictionary 1048–49 (1969). "[I]t refers to the larger value of life, the life at the pleasure of society, if you will, the life—the value including economic, including moral, including philosophical, including all the value with which you

might hold life." *Sherrod v. Berry*, 629 F.Supp. 159, 163 (N.D.Ill.1985), *vacated*, 835 F.2d 1222 (7th Cir.1988), *rev'd on other grounds*, 856 F.2d 802 (7th Cir.1988).

6. RSA 556:12 states:

**Damages for Wrongful Death, Elements.** If the administrator of the deceased party is plaintiff, and the death of such party was caused by the injury complained of in the action, the mental and physical pain suffered by the deceased in consequence of the injury, the reasonable expenses occasioned to his estate by the injury, the probable duration of his life but for the injury, and his capacity to earn money during his probable working life, may be considered as elements of damage in connection with other elements allowed by law, in the same manner as if the deceased had survived.

Hampshire Supreme Court has made it clear that no such damages are allowed.

> In the nature of things one may not himself receive compensation for the wrongful loss of his right to live, and claim for the loss cannot be an asset of his estate in any fair view of the compensatory principle of allowable elements of damages. While allowance for bodily and mental suffering is granted as in [sic] justice imposed on a wrongdoer, the estimate must be within the bounds of justice. To allow for the enjoyment of continued life would mean an entrance into a boundless field of arbitrary assessment, for which no policy of the law exists.

*Ham v. Interstate Bridge Auth.*, 92 N.H. 268, 275–76, 30 A.2d 1, 6 (1943).[7] For related discussion, *see Downie v. United States Lines Co.*, 359 F.2d 344, 346–47 (3d Cir. 1966), *and* Annotation, *Loss of Enjoyment of Life as a Distinct Element or Factor in Awarding Damages for Bodily Injury*, 34 A.L.R.4th 293 (1984). Accordingly, plaintiffs' claim for hedonic damages is dismissed.

*4. 42 U.S.C. § 1395dd*

■ Defendants also attack plaintiffs' attempt to found liability on a statutory duty of care allegedly established in the Consolidated Omnibus Reconciliation Act of 1986 ("COBRA") at 42 U.S.C. § 1395dd. Under COBRA, hospitals that have emergency departments and participate in the Medicare program must provide screening examinations for all patients and treatment to those patients with emergency medical conditions.

■ The violation of a statutory standard of conduct can constitute negligence and may give rise to liability in tort. *Bagley v. Controlled Env't Corp.*, 127 N.H. 556, 563, 503 A.2d 823, 827–28 (1986); *Moulton v. Groveton Papers Co.*, 112 N.H. 50, 52, 289 A.2d 68, 71 (1972). A claim of negligence may be founded on a failure to satisfy such a standard of conduct "when the consequences contemplated by the stat-

ute have actually resulted from the violation." *Collier v. Redbones Tavern & Restaurant, Inc.*, 601 F.Supp. 927, 931 (D.N.H. 1985). *See also* Restatement (Second) of Torts § 286 comment on clause (b) (1965). A review of COBRA reveals that the consequences which it contemplated have not resulted from the negligent conduct as alleged by plaintiffs.

That section of COBRA relevant to this case, the Emergency Medical Treatment and Active Labor Act, was enacted to combat the growing problem of "patient dumping". *Bryant v. Riddle Mem. Hosp.*, 689 F.Supp. 490, 491 (E.D.Pa.1988). *See generally*, Note, *Preventing Patient Dumping: Sharpening the COBRA's Fangs*, 61 N.Y. U.L.Rev. 1186, 1187 (1986). The Committee on Ways and Means emphasized the economic concerns upon which the law was founded.

> The Committee is greatly concerned about the increasing number of reports that hospital emergency rooms are refusing to accept or treat patients with emergency conditions if the patient does not have medical insurance. The Committee is most concerned that medically unstable patients are not being treated appropriately. There have been reports of situations where treatment was simply not provided. In numerous other instances, patients in an unstable condition have been transferred improperly, sometimes without the consent of the receiving hospital. The committee wants to provide a strong assurance that pressures for greater hospital efficiency are not to be construed as license to ignore traditional community responsibilities and loosen historic standards.

H.R.Rep. No. 241(II), 99th Cong., 1st Sess. 27, *reprinted in* 1986 U.S.Code Cong. & Admin. News 42, 605. As explained by one of its chief proponents, the law

> addresses an issue which has gained much public attention over the last year. The CBS news show "60 minutes" ran a segment exposing the inappropriate

---

7. Plaintiffs' argument that *Ham* was superceded by RSA 556:12 is not persuasive. The plain language of the statute makes clear that the legislature intended to incorporate and build upon existing common law, not abrogate it, as plaintiffs suggest.

transfer of a number of seriously ill patients from the emergency rooms of private hospitals to public hospitals.

Just last June, the Washington Post chronicled a Dallas case of a badly burned laborer who was turned away from a number of hospitals before he could get the treatment he badly needed. I hope we have agreement on this point: the practice of rejecting indigent patients in life threatening situations for economic reasons alone is unconscionable.

131 Cong.Rec. S 13, 903 (daily ed. Oct. 23, 1985) (statement of Sen. Durenberger).

This legislative history reveals the congressional intent behind the Act: to provide some assurance that patients with emergency medical conditions will be examined and treated regardless of their financial resources. Plaintiffs here do not allege that their financial condition or lack of health insurance contributed to Dr. Estabrook's decision not to treat their son. The interest which Congress sought to protect by enacting 42 U.S.C. § 1395dd was not invaded by the defendant's conduct as here alleged and, accordingly, plaintiffs' negligence per se theory cannot be sustained.

For the reasons stated hereinabove, defendants' motion to dismiss in part and for partial summary judgment (document no. 20) is herewith granted.

As to plaintiffs' motion for special assignment, the Court directs counsels' attention to Local Rule 15(a), which states in relevant part that the calendar of this court will not be adjusted to accommodate conflicts in the schedules of expert witnesses. "Depositions by videotape or other methods are easily available and such should be used in any instance where counsel has the slightest doubt as to the availability of any witness at the time of trial." *Id.* Plaintiffs' motion for special assignment (document no. 31) is herewith denied.

SO ORDERED.