Gloria Ivette CORREA, a/k/a Gloria
Ivette Correa Gonzalez, et al.,
Plaintiffs, Appellees,

v.

HOSPITAL SAN FRANCISCO,
Defendant, Appellant.

No. 95–1167.

United States Court of Appeals,
First Circuit.

Submitted Sept. 6, 1995.

Decided Oct. 31, 1995.

Igor J. Dominguez, on brief, Hato Rey, PR, for appellant.

Kevin G. Little, Los Angeles, CA, and Law Offices of David Efron, Rio Piedras, PR, on brief, for appellees.

Before SELYA, Circuit Judge, COFFIN, Senior Circuit Judge, and BOUDIN, Circuit Judge.

SELYA, Circuit Judge.

This appeal requires us to interpret, for the first time, the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd (1988 & Supp. V 1993).[1] After scrutinizing the record and dovetailing the facts with the statutory scheme, we affirm a $700,000 jury verdict in favor of the heirs and survivors of Carmen Gloria Gonzalez Figueroa (Ms. Gonzalez) against defendant-appellant Hospital San Francisco (HSF or the Hospital).

## I. THE FACTS

■ We are guided through the thicket of conflicting testimony and the chasmal gaps in the direct evidence by the rule that, when the losing party protests the sufficiency of the evidence, the court of appeals must take both the facts and the reasonable inferences therefrom in the light most hospitable to the jury's verdict. *See Sanchez v. Puerto Rico Oil Co.*, 37 F.3d 712, 716 (1st Cir.1994); *Wagenmann v. Adams*, 829 F.2d 196, 200 (1st Cir.1987).

According to her son, Angel Correa, Ms. Gonzalez, a sixty-five-year-old widow, awoke on the morning of September 6, 1991 "feeling real bad," and experiencing "chills, cold sweat, dizziness, [and] chest pains." She requested that Angel take her to the emergency room at HSF (where she had been treated previously). She arrived there no later than 1:00 p.m.

The evidence is conflicted as to whom she saw and what that person was told about her condition. Angel testified that he implored the receptionist to have someone "take care of my mother, because she feels sick and has chest pains." The Hospital disagrees, maintaining that its personnel were told only that Ms. Gonzalez felt dizzy and nauseated. In any event, a Hospital employee assigned the patient a number (forty-seven), told her to bide her time, and checked her medical insurance card.[2] After waiting approximately

---

1. In *Wilson v. Atlanticare Med. Ctr.*, 868 F.2d 34 (1st Cir.1989), the plaintiff asked us to consider whether a state statute prescribing a medical malpractice claims procedure applied to suits under EMTALA. *See id.* at 35. We refused, however, because the plaintiff had not preserved the issue. *See id.* at 35–36.

2. Ms. Gonzalez's health insurance plan required her to seek routine treatment at Hospmed (a local clinic) during its business hours, but allowed her to see any appropriate health-care provider in case of an emergency.

one hour, Angel called his sister, Esther Correa, and asked her to relieve him. Esther arrived some fifteen minutes later and Angel left the premises. At that very moment (roughly 2:15 p.m.), he heard an attendant calling patient number twenty-four for treatment.

Now accompanied by her daughter, Ms. Gonzalez maintained her unproductive vigil for an additional forty-five to seventy-five minutes. The Hospital staff continued blithely to ignore her. Weary of waiting, the two women drove to the office of Dr. Acacia Rojas Davis (Dr. Rojas), the director of Hospmed, arriving there between 3:00 and 3:30 p.m. According to Dr. Rojas, a nurse called from HSF to advise her that the patient would be coming to Hospmed for treatment. Dr. Rojas said that this conversation probably occurred earlier that day (perhaps around 1:00 p.m.), a datum suggesting that HSF tried to shunt Ms. Gonzalez to Hospmed as soon as it scrutinized her insurance card.

Ms. Gonzalez informed Dr. Rojas that she was nauseated and had taken a double dose of her high blood pressure medication. Her blood pressure was very low (90/60), and, when she began vomiting, the physician immediately started intravenous infusions of fluids. She also dispensed medicine to control the emesis. Despite these ministrations, Ms. Gonzalez's condition steadily deteriorated. Dr. Rojas had to resuscitate her soon after her arrival. The doctor then attempted to transfer her to the Hato Rey Community Hospital, but could not commandeer an ambulance. As Dr. Rojas began preparations to transport Ms. Gonzalez by van, the patient expired. Her death, which occurred at around 4:30 p.m., was attributed to hypovolemic shock.

## II. THE PROCEEDINGS BELOW

The plaintiffs—Ms. Gonzalez's three adult children and four of her grandchildren (the progeny of her late son, Felix Correa, who had predeceased her)—brought suit against the Hospital in the United States District Court for the District of Puerto Rico.[3] They alleged two violations of EMTALA—inappropriate screening and improper transfer—and a pendent claim of medical malpractice under local law. Following a trial, the plaintiffs' case went to the jury on the two theories of EMTALA liability.[4] The jury returned a series of special written findings, Fed. R.Civ.P. 49(a), assessed $200,000 in damages on the decedent's account (payable to the heirs), and assessed $500,000 in damages for the pain, suffering, and mental anguish experienced by the survivors—$100,000 apiece for the three children (Angel, Esther, and Gloria), and $50,000 apiece for the four grandchildren (Glendalis, Glorimar, Angelis, and Sarai). The district court denied the Hospital's post-trial motions for judgment as a matter of law, a new trial, and remission of damages. This appeal ensued.

## III. THE STATUTORY SCHEME

We delineate EMTALA's requirements in order to give definition to the statutory cause of action and place some of its nuances into perspective.

■ As health-care costs spiralled upward and third-party payments assumed increased importance, Congress became concerned "about the increasing number of reports that hospital emergency rooms are refusing to accept or treat patients with emergency conditions if the patient does not have medical insurance." H.R.Rep. No. 241(I), 99th Cong., 1st Sess. 27 (1986), *reprinted in* 1986 U.S.C.C.A.N. 42, 605. Congress enacted EMTALA to allay this concern. Needing a carrot to make health-care providers more receptive to the stick, Congress simultaneously amended the Social Security Act, conditioning hospitals' continued participation in the federal Medicare program—a lucrative source of institutional revenue—on acceptance of the duties imposed by the new

---

3. Although their complaint is not a model of clarity, the plaintiffs apparently sued in two capacities. As Ms. Gonzalez's heirs, they asserted a representative-capacity claim for her pain, suffering, and related damages. As individuals, they simultaneously asserted claims for their own pain, suffering, mental anguish, and kindred losses.

4. The district court dismissed the malpractice claim. That ruling is not before us on appeal.

law. *See* 42 U.S.C. § 1395dd(a-b), (e)(2); *see also Abercrombie v. Osteopathic Hosp. Founders Ass'n,* 950 F.2d 676, 680 (10th Cir. 1991); *Brooker v. Desert Hosp. Corp.,* 947 F.2d 412, 414 (9th Cir.1991).

We have set out the portions of the statute that are most germane to this appeal in an appendix. For purposes of patients such as Ms. Gonzalez, EMTALA has two linchpin provisions. First, it requires that a participating hospital afford an appropriate medical screening to all persons who come to its emergency room seeking medical assistance. *See* 42 U.S.C. § 1395dd(a). Second, it requires that, if an emergency medical condition exists, the participating hospital must render the services that are necessary to stabilize the patient's condition, *see id.* § 1395dd(b)(1)(A), unless transferring the patient to another facility is medically indicated and can be accomplished with relative safety, *see id.* § 1395dd(b)(1)(B), (c)(1). To add bite to its provisions, EMTALA establishes monetary penalties for noncompliance, *see id.* § 1395dd(d)(1), and authorizes private rights of action against those who transgress its mandates, *see id.* § 1395dd(d)(2).

■ To establish an EMTALA violation, a plaintiff must show that (1) the hospital is a participating hospital, covered by EMTALA, that operates an emergency department (or an equivalent treatment facility); (2) the patient arrived at the facility seeking treatment; and (3) the hospital either (a) did not afford the patient an appropriate screening in order to determine if she had an emergency medical condition, or (b) bade farewell to the patient (whether by turning her away, discharging her, or improvidently transferring her) without first stabilizing the emergency medical condition. *See Miller v. Med-*

*ical Ctr. of S.W. La.,* 22 F.3d 626, 628 (5th Cir.1994); *Stevison v. Enid Health Sys., Inc.,* 920 F.2d 710, 712 (10th Cir.1990).

■ HSF attempts to read into section 1395dd(a) an additional requirement: that the patient show that she in fact suffered from an emergency medical condition when she arrived at the emergency room. But EMTALA imposes no such requirement. The statute by its terms directs a participating hospital to provide an appropriate screening to all who come to its emergency department. Thus, to prove a violation of EMTALA's screening provisions, a plaintiff need not prove that she actually suffered from an emergency medical condition when she first came through the portals of the defendant's facility; the failure appropriately to screen, by itself, is sufficient to ground liability as long as the other elements of the cause of action are met.[5]

## IV.  ANALYSIS

HSF assigns error in no fewer than eight iterations. It debunks the sufficiency of the evidence in five respects. It then hypothesizes that, even if the evidence on these points can withstand an instructed verdict, it is so anemic that the district court should have repudiated the jury's findings on liability and ordered a new trial. The climax of the Hospital's asseverational array denigrates the award of damages in two respects. After careful perscrutation of both the record and the rich variety of challenges marshalled by HSF, we affirm.

### A.  *Sufficiency of the Evidence.*

The Hospital's multi-pronged attack calls into play varying standards of appellate review. The first five claims of error all in-

---

5. To be sure, some courts have suggested in dictum that a plaintiff must show, as an ingredient of an inappropriate screening claim, that she suffered from an emergency medical condition when she arrived at the hospital. *See, e.g., Miller,* 22 F.3d at 630 n. 8; *Ruiz v. Kepler,* 832 F.Supp. 1444, 1447 (D.N.M.1993); *Huckaby v. East Ala. Med. Ctr.,* 830 F.Supp. 1399, 1402 (M.D.Ala.1993). This suggestion finds no purchase in the statute's text, and we reject it. We note, however, that while this distinction may have implications for civil penalties, which are imposable irrespective of resulting harm, *see* 42

U.S.C. § 1395dd(d)(1)(A), the statutory damage remedy requires a showing of "personal harm as a direct result of a participating hospital's violation of [EMTALA]," *id.* § 1395dd(d)(2)(A). It is difficult to imagine a case in which a patient who does not present an emergency medical condition will meet the statute's causation requirement or fall within the category of those whom it intends to protect. In all events, we can reserve such questions for another day, because the plaintiffs fairly allege that Ms. Gonzalez did present an emergency medical condition, the jury so found, and the evidence to that effect was ample.

volve the sufficiency of the evidence, and, hence, are reviewed under a familiar set of rules.

The district court's denial of a motion for judgment as a matter of law poses a question of law and, therefore, this court's review of such a ruling is plenary. *See Gibson v. City of Cranston,* 37 F.3d 731, 735 (1st Cir.1994). In addressing such issues on appeal, we must approach the evidence from a coign of vantage identical to that employed by the district court in the first instance. *See Rolon–Alvarado v. Municipality of San Juan,* 1 F.3d 74, 77 (1st Cir.1993). This dictates that we take the record in the light most flattering to the nonmoving party, without probing the veracity of the witnesses, resolving conflicts in the testimony, or assaying the weight of the evidence. *See Gibson,* 37 F.3d at 735; *Wagenmann,* 829 F.2d at 200. We "may reverse the denial of such a motion only if reasonable persons could not have reached the conclusion that the jury embraced." *Sanchez,* 37 F.3d at 716.

1. *EMTALA Coverage.* The Hospital starts its series of sufficiency sorties by solemnly stating that the survivors stumbled in failing to show that it is subject to EMTALA's suzerainty. We need not tarry. HSF tacitly concedes that, in general, federal courts have jurisdiction over EMTALA claims, *see Thornton v. Southwest Detroit Hosp.,* 895 F.2d 1131, 1133 (6th Cir.1990), but argues that the plaintiffs did not prove a requisite predicate fact: that HSF had accepted the federal government's carrot and agreed to come under EMTALA.[6] This argument has the shrill ring of desperation.

The plaintiffs introduced into evidence, without objection, HSF's policy statement outlining for its employees and associates how the Hospital intended to ensure compliance with EMTALA in its emergency room. The Hospital solidified this proffer when, during the defense case, its health services administrator testified that he had dutifully instructed his staff regarding the fine points of EMTALA compliance. Evidence admitted without limitation can be used by the jury on any issue in the case. *See, e.g., United States v. Castro–Lara,* 970 F.2d 976, 981 (1st Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2935, 124 L.Ed.2d 684 (1993). Here, the policy statement and the executive's testimony, without more, formed a sturdy basis on which the jury could build an eminently reasonable inference that the Hospital considered itself to be—and was— covered by EMTALA.

HSF strives to topple this edifice, contending that the policy statement constituted inadmissible hearsay and that the plaintiffs did not lay a proper foundation for the document's introduction. But in the absence of plain error—and we discern none here—these objections, voiced for the first time on appeal, are deemed to have been waived. *See Suarez–Matos v. Ashford Presbyterian Community Hosp., Inc.,* 4 F.3d 47, 50 (1st Cir.1993); *Freeman v. Package Mach. Co.,* 865 F.2d 1331, 1336 (1st Cir.1988); *see also* Fed.R.Evid. 103. Hence, the jury had a rational basis on which to conclude that HSF is among the ninety-nine percent of American hospitals covered by EMTALA.

2. *Failure to Provide Appropriate Screening.* Three of the Hospital's remaining four sufficiency-of-the-evidence claims are inextricably intertwined. These three claims are designed to illustrate the purported lack of any foundation for a finding that HSF failed to provide Ms. Gonzalez with an appropriate screening upon her appearance at the emergency room. The final sufficien-

---

**6.** In its brief, the Hospital treats this issue as implicating the court's subject matter jurisdiction. The Hospital, of course, could have raised the question in that form by a pretrial motion, *see* Fed.R.Civ.P. 12(b)(1), but refrained. Since the defendant did not so move, and since the disputed fact is one that has the capacity not only to oust the federal court of jurisdiction but also to defeat the claim on the merits (because the same fact that is needed to support jurisdiction must also be demonstrated to the factfinder in order

for the plaintiff to prevail), an appellate court should evaluate the jury's factual finding under a sufficiency-of-the-evidence test. *Cf. United States v. Victoria–Peguero,* 920 F.2d 77, 87 (1st Cir. 1990) (undertaking sufficiency-of-the-evidence review following a jury determination that a ship was within territorial waters, where such a fact was both a predicate for criminal jurisdiction and an element of the offense charged), *cert. denied,* 500 U.S. 932, 111 S.Ct. 2053, 114 L.Ed.2d 458 (1991).

cy claim is closely related to the first three initiatives. In it, HSF posits that, as long as a hospital is not motivated by crass economic considerations, any failure appropriately to screen does not run afoul of EMTALA. These importunings lack merit.[7]

#### a.

■ We begin this analytic segment by laying a straw man to rest. The Hospital asserts that it had no obligation to screen because Ms. Gonzalez did not have an emergency medical condition when she reported to its facility. This theory of defense is doubly flawed. For one thing, EMTALA requires participating hospitals to provide appropriate screening to all who enter the hospitals' emergency departments, whether or not they are in the throes of a medical emergency when they arrive. *See supra* note 5 and accompanying text. For another thing, the record does not compel a conclusion that the decedent's emergency condition developed only after she consulted Dr. Rojas.

■ Angel Correa testified that he told HSF's receptionist that his mother was experiencing chest pains, and HSF concedes that a patient of Ms. Gonzalez's age who suffered from chest pains would be regarded as having an emergency medical condition. Yet the Hospital asks us to ignore this evidence in deference to Dr. Rojas's testimony that Ms. Gonzalez did not develop chest pains until some time after she arrived at Hospmed. There is no principled way in which we can accommodate HSF's request. Credibility choices are generally for the jury, not for the court of appeals. *See Cook v. Rhode Island Dep't of Mental Health, Retardation, and Hosps.*, 10 F.3d 17, 21 (1st Cir. 1993). What is more, Dr. Rojas's testimony does not rule out a finding that Ms. Gonzalez exhibited an emergency medical condition when she arrived at HSF. The chest pains might well have spurted and later subsided, or, even if Ms. Gonzalez only complained of nausea and dizziness, that symptomatology (as Dr. Rojas explained) might well herald the onset of an emergency medical condition

in the case of a hypertensive diabetic (such as Ms. Gonzalez).

#### b.

We next assess the Hospital's insistence that it gave Ms. Gonzalez the same (suitable) screening provided to all patients. EMTALA requires an appropriate medical screening, but does not explain what constitutes one. The adjectival phrase is not self-defining. *See Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d 266, 271 (6th Cir.1990) (" 'Appropriate' is one of the most wonderful weasel words in the dictionary, and a great aid to the resolution of disputed issues in the drafting of legislation. Who, after all, can be found to stand up for 'inappropriate' treatment or actions of any sort?"). In the last analysis, appropriateness, like nature, is "a mutable cloud which is always and never the same." Ralph Waldo Emerson, *Essays: First Series* (1841).

■ Be that as it may, the courts have achieved a consensus on a method of assessing the appropriateness of a medical examination in the EMTALA context. A hospital fulfills its statutory duty to screen patients in its emergency room if it provides for a screening examination reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients and provides that level of screening uniformly to all those who present substantially similar complaints. *See Baber v. Hospital Corp. of Am.*, 977 F.2d 872, 879 (4th Cir.1992); *Gatewood v. Washington Healthcare Corp.*, 933 F.2d 1037, 1041 (D.C.Cir.1991). The essence of this requirement is that there be some screening procedure, and that it be administered even-handedly.

■ We add a caveat: EMTALA does not create a cause of action for medical malpractice. *See Gatewood*, 933 F.2d at 1041. Therefore, a refusal to follow regular screening procedures in a particular instance contravenes the statute, *see Baber*, 977 F.2d at 879, but faulty screening, in a particular case, as opposed to disparate screening or refusing

---

**7.** Because we uphold the jury's finding that HSF violated EMTALA when it failed to afford Ms. Gonzalez an appropriate screening, we need not comment upon the jury's finding that HSF also violated EMTALA by improperly transferring Ms. Gonzalez before her condition had stabilized.

to screen at all, does not contravene the statute. *See Brooks v. Maryland Gen. Hosp.,* 996 F.2d 708, 711 (4th Cir.1993). In this case, HSF's delay in attending to the patient was so egregious and lacking in justification as to amount to an effective denial of a screening examination. Thus, we need not decide whether mere negligence in failing to expedite screening would itself violate the federal statute.

To illustrate our point, it should be recalled that HSF prescribed internal procedures which set the parameters for an appropriate screening. HSF's rules, as explicated in its policy statement, required its emergency room personnel, *inter alia,* promptly to take the vital signs of every patient who visited the facility, to make a written record of all such visits, to treat patients suffering from chest pains as critical cases, and to refer all critical cases to an in-house physician immediately. From the evidence adduced at trial, especially Angel Correa's recollections and the Hospital's utter inability to produce *any* records anent Ms. Gonzalez's visit, the jury reasonably could have inferred that the Hospital did not measure up to the parameters it had established, and that the decedent was denied the screening (monitoring of vital signs, compilation of a written chart, immediate referral to an in-house physician) that HSF customarily afforded to persons complaining of chest pains.

That ends the matter. Bearing in mind that, under EMTALA § 1395dd(a), the same screening examination must be made available to all similarly situated patients, *see Brooks,* 996 F.2d at 710–11; *Baber,* 977 F.2d at 881, the jury's finding that HSF denied Ms. Gonzalez an appropriate screening examination is unimpugnable.

### c.

In an allied vein, the Hospital contends that it neither denied Ms. Gonzalez an initial screening nor refused her essential treatment. Its point is that it gave the patient a number, and would have ministered to her had she waited. This contention is spurious.

First, according to Dr. Rojas, HSF referred Ms. Gonzalez to Hospmed. If the jury believed the physician's testimony—and we note, as an aside, that HSF called Dr. Rojas as its witness—it could well have found that HSF never intended to treat the decedent, or, at the least, was itself responsible for truncating her wait. Second, we think that regardless of motive, a complete failure to attend a patient who presents a condition that practically everyone knows may indicate an immediate and acute threat to life can constitute a denial of an appropriate medical screening examination under section 1395dd(a). Much depends upon circumstances; we recognize that an emergency room cannot serve everyone simultaneously. But we agree with the court below that the jury could rationally conclude, absent any explanation or mitigating circumstances, that the Hospital's inaction here amounted to a deliberate denial of screening. EMTALA should be read to proscribe both actual and constructive dumping of patients.

### d.

HSF maintains that depriving a patient of an appropriate screening, in and of itself, will not support an EMTALA claim. It suggests that a hospital can be liable for transgressing the statute only if economic concerns, such as the suspicion that the patient will be unable adequately to pay her way, drive the hospital's actions. Since Ms. Gonzalez had insurance that permitted her hospital visit if an emergency existed, its thesis continues, its handling of her case could not have been motivated by concerns about her ability to pay.[8] As phrased, this contention raises a question of law, engendering de novo review. *See Foster–Miller, Inc. v. Babcock & Wilcox Can.,* 46 F.3d 138, 147 (1st Cir.1995).

Every court of appeals that has considered this issue has concluded that a desire to shirk the burden of uncompensated care is

---

**8.** In all events, this argument is an oversimplification. Especially in the health-care field, all insurance plans are not created equal. Given the bewildering array of coverage conditions, deductibles, reimbursement rates, and the like, sophisticated but esurient providers have ample provocation to discriminate not only between insured and uninsured patients but also among patients who are insured under different plans.

not a necessary element of a cause of action under EMTALA. *See, e.g., Power v. Arlington Hosp. Ass'n,* 42 F.3d 851, 857 (4th Cir. 1994); *Collins v. DePaul Hosp.,* 963 F.2d 303, 308 (10th Cir.1992); *Gatewood,* 933 F.2d at 1040.[9] We think that these cases are correctly decided, and that EMTALA does not impose a motive requirement. The decision on which the Hospital relies, *Nichols v. Estabrook,* 741 F.Supp. 325 (D.N.H.1989), did not involve failure to screen, but merely a misdiagnosis. We hold, therefore, that EMTALA, by its terms, covers all patients who come to a hospital's emergency department, and requires that they be appropriately screened, regardless of insurance status or ability to pay. *See* 42 U.S.C. § 1395dd(a).

### B. *New Trial.*

▮ We turn now to the Hospital's complaint that the lower court erred in declining to honor its motion for an unconditional new trial. Our reexamination of this ruling is extremely circumscribed. Principally because the trial judge saw and heard the witnesses in the raw, his refusal to uproot a jury verdict may only be reversed for abuse of discretion. *See Quinones–Pacheco v. American Airlines, Inc.,* 979 F.2d 1, 3 (1st Cir.1992); *Veranda Beach Club Ltd. Partnership v. Western Sur. Co.,* 936 F.2d 1364, 1384 (1st Cir.1991). This means, in effect, that an appellate court may set aside such a ruling only if it determines that "the verdict is against the demonstrable weight of the credible evidence or results in a blatant miscarriage of justice." *Sanchez,* 37 F.3d at 717.

Refined to bare essence, HSF's claim is that, even if the plaintiffs introduced enough proof to withstand judgment as a matter of law, the verdict defied the weight of the trustworthy evidence. In support, the Hospital reiterates the points previously discussed, terming the evidence asthenic as to HSF's status under EMTALA and as to its purported violations of the law.

We will not repastinate the ground that we ploughed earlier in this opinion. The evidence regarding the relationship of EMTALA to HSF, *see supra* Part IV(A)(1), strikes us as rather persuasive, especially since HSF—which could have supplied a foolproof answer from its own records—offered nothing to suggest that it did not welcome Medicare patients. As to the other points, *see supra* Part IV(A)(2), the jury heard testimony from which it could have concluded that Ms. Gonzalez went to the Hospital in critical condition and received only a high number and a cold shoulder. Angel Correa's credibility emerged relatively unscathed from cross-examination; we cannot fault the jury either for crediting his recollection or for concluding that the Hospital denied Ms. Gonzalez any vestige of an appropriate screening.

▮ To be sure, the evidence in this case is not particularly precise. But facts at trial, as in life, do not always appear in black and white. Juries and judges frequently must distinguish between manifold shades of gray. The limited review that we can conduct convinces us that the grays predominate here, that the jury's finding of EMTALA liability is within the spectrum of acceptable outcomes, and that the trial judge did not abuse his discretion in refusing to paint over the jury's collective judgment. No more is exigible. *See Freeman,* 865 F.2d at 1333–34 ("The mere fact that a contrary verdict may have been equally—or even more easily—supportable furnishes no cognizable ground for granting a new trial. If the weight of the evidence is not grotesquely lopsided, it is irrelevant that the judge, were he sitting jury-waived, would likely have found the other way.").

### C. *Damages.*

On the final leg of our journey, we traverse the Hospital's two challenges to the award of damages. In substance, HSF maintains (a)

---

9. In *Cleland,* the Sixth Circuit held, as have other courts, that a fear of nonpayment is not essential to triggering an EMTALA claim. *See* 917 F.2d at 272. *Cleland* is different, however, in that the court required there to be *some* motive—whether or not economic—for the disparate treatment. *See id.* Other courts have declined to follow the Sixth Circuit's lead in this respect, *see, e.g., Gatewood,* 933 F.2d at 1041 n. 3, and we agree that the range of improper motives available under the *Cleland* standard "is so broad as to be no limit at all, and as a practical matter amounts to not having a motive requirement." *Power,* 42 F.3d at 857.

that the plaintiffs may recover under EMTA-LA only those damages stemming from the decedent's pain and suffering, and (b) that in all events, the jury exhibited excessive generosity. These challenges must be considered separately for they evoke differing legal principles and standards of review.

■ 1. *Recoverable Damages.* Since questions such as whether a statute authorizes damages in particular instances or in favor of particular parties are quintessentially legal in nature, we afford de novo review. *See EEOC v. Bank of Billings,* 758 F.2d 397, 401 (9th Cir.), *cert. denied,* 474 U.S. 902, 106 S.Ct. 228, 88 L.Ed.2d 228 (1985); *see also Strickland v. Commissioner, Me. Dep't of Human Servs.,* 48 F.3d 12, 16 (1st Cir.1995). HSF's claim that the plaintiffs cannot recover damages under EMTALA for their own pain, suffering, and anguish falls into this category. Undertaking de novo review, we conclude that this claim is voiced too late and augurs too little.

■ The chronology of the case speaks volumes about the lack of timeliness. HSF first had the opportunity to assert this defense in its answer to the plaintiffs' complaint, but did not do so. In its submissions ancillary to both the initial scheduling conference and the pretrial conference, *see* Fed.R.Civ.P. 16, HSF likewise omitted any reference to the defense. The latter omission is especially significant. The pretrial conference is an important event in the life of a litigated case. It is designed to assist the court in "formulati[ng] ... the issues, including the elimination of frivolous claims or defenses." Fed.R.Civ.P. 16(c)(1). Along the same line, the pretrial order is intended to shape the contours of the ensuing trial by setting forth the legal theories upon which the parties intend to rely. *See* D.P.R.Loc.R. 314.3(E). Here, HSF undermined these mechanisms. It failed to assert the defense at the pretrial conference, and, consequently, the pretrial order, signed by all counsel and entered by the district court, made no mention of any contention that EMTALA barred recovery for the heirs' anguish and suffering.

The Hospital's neglect continued up to, and through, the trial proper. In its trial brief, HSF enumerated only three legal issues to be considered at trial. None of these dealt with the question of whether persons other than patients (or those suing in a patient's behalf) could recover damages under EMTALA. At the close of the plaintiffs' case, HSF unsuccessfully moved for judgment as a matter of law, *see* Fed.R.Civ.P. 50(a), but without calling the court's attention to the alleged impropriety of compensating the plaintiffs for their own pain and suffering. At the close of all the evidence, the Hospital renewed its Rule 50(a) motion, but did not add any new grounds. To cinch matters, the Hospital eschewed any objection to the trial court's inclusion of the plaintiffs' claims for their own pain, suffering, and mental anguish in the verdict forms and the jury instructions. This was a waiver, pure and simple. *See* Fed.R.Civ.P. 49(a), 51; *see also Putnam Resources v. Pateman,* 958 F.2d 448, 456 (1st Cir.1992) ("Silence after instructions, including instructions on the form of the verdict to be returned by the jury, typically constitutes a waiver of any objections.").

■ Based on this somber record of inattention, we hold that HSF forfeited the theory of defense that it now espouses. In reaching this conclusion, we give special weight to the Hospital's boycott of the final pretrial order. That order is intended to "control the subsequent course of the action," and can be modified only "to prevent manifest injustice." Fed.R.Civ.P. 16(e). An appellate court should not lightly relieve a litigant from the condign consequences of its failure to list a theory of defense at that critical stage of the proceedings. *See, e.g., Ramirez Pomales v. Becton Dickinson & Co.,* 839 F.2d 1, 3 (1st Cir.1988) (explaining that issues not included in the final pretrial order are generally waived). If pretrial orders are to achieve their intended purpose, "courts and litigants must ordinarily take them seriously." *Roland M. v. Concord Sch. Comm.,* 910 F.2d 983, 999 (1st Cir.1990), *cert. denied,* 499 U.S. 912, 111 S.Ct. 1122, 113 L.Ed.2d 230 (1991).

■ While waivers are sometimes overlooked on appeal, none of the possible routes around HSF's waiver are passable. The suggestion that the Rule 50(a) motion preserved the defense is little short of jejune.

A motion for judgment as a matter of law made at the close of all the evidence preserves for review only those grounds specified at the time, and no others. *See Sanchez,* 37 F.3d at 723; *Sweeney v. Westvaco Co.,* 926 F.2d 29, 37 (1st Cir.), *cert. denied,* 502 U.S. 899, 112 S.Ct. 274, 116 L.Ed.2d 226 (1991). By the same token, the suggestion that HSF's post-trial motion for judgment notwithstanding the verdict—a motion in which HSF for the first time made a claim that EMTALA did not authorize a recovery by the plaintiffs for their own pain, suffering, and anguish—saves the day is equally unavailing. Indeed, this motion is a classic example of a litigant locking the barn door long after the horse has bolted. As the name implies, a renewed motion for judgment as a matter of law under Fed.R.Civ.P. 50(b) is bounded by the movant's earlier Rule 50(a) motion. The movant cannot use such a motion as a vehicle to introduce a legal theory not distinctly articulated in its close-of-evidence motion for a directed verdict. *See Sanchez,* 37 F.3d at 723; *Perdoni Bros., Inc. v. Concrete Sys., Inc.,* 35 F.3d 1, 3 (1st Cir.1994); *Systemized of New Eng., Inc. v. SCM, Inc.,* 732 F.2d 1030, 1035–36 (1st Cir. 1984); *see also* James W. Moore, 5A *Moore's Federal Practice* ¶ 50.08 (2d ed. 1994) (explaining that a motion for judgment after the verdict under Rule 50(b) "may only be premised upon particular grounds raised in the earlier motion made at the close of all the evidence," and that, accordingly, "any argument omitted from the motion made at the close of the evidence is waived as a ground for judgment under Rule 50(b)").

■■■ The last possibility that we consider relates to the reality that the raise-or-waive rule (like virtually all subsets of the plain error principle) admits of an occasional exception in the interests of justice. Thus, the court of appeals has discretion to relieve a party from the normal consequences of failure to proffer a defense in a timeous manner. *See United States v. La Guardia,* 902 F.2d 1010, 1013 (1st Cir.1990) (holding that "an appellate court has discretion, in an exceptional case, to reach virgin issues"); *accord Singleton v. Wulff,* 428 U.S. 106, 121, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976); *United States v. Krynicki,* 689 F.2d 289, 291–

92 (1st Cir.1982). But the exceptions are few and far between, and appellate discretion should not be affirmatively exercised unless error is plain and the equities heavily preponderate in favor of correcting it. To meet this benchmark, the omitted argument ordinarily will have to be "highly persuasive," and declining to reach it will have to portend "a miscarriage of justice." *Krynicki,* 689 F.2d at 292. Taking into account the dimensions of this obstacle, we discern no compelling basis for invoking this court's discretion.

■■■ EMTALA looks to state law, broadly defined to include Puerto Rico law, *see* 42 U.S.C. §§ 410(h), 1395x(x), anent the availability of damages. It contains the following instruction:

> Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located. . . .

42 U.S.C. § 1395dd(d)(2). HSF's argument in effect proposes that we construe the words "individual" and "direct" as denoting the patient herself, and no one else. But this is only one of two possible constructions of the statute. It is equally open to read the law as permitting an individual who has a special relationship with another—say, a wife deprived of consortium or, as here, a bereaved relative—to sue when she is harmed in direct consequence of an EMTALA violation inflicted upon such other. When death results, this reading would naturally extend the statutory prerogative to individuals who are eligible to bring survivors' actions under local law. *See, e.g., Lane v. Calhoun–Liberty County Hosp. Ass'n, Inc.,* 846 F.Supp. 1543, 1553 (N.D.Fla.1994) (permitting claimants to recover those damages available to survivors under Florida law); *Griffith v. Mount Carmel Med. Ctr.,* 842 F.Supp. 1359, 1365 (D.Kan.1994) (affirming award of damages to wife and children of a decedent).

Since both readings are superficially plausible, we cannot say it was plain error for the lower court, in the absence of any timely

objection, to interpret the statute generously, thus providing remediation for the decedent's heirs comparable to that which they would ordinarily receive under local law. *See Widow of Delgado v. Boston Ins. Co.*, 101 P.R. Dec. 598, 599–60 (1 Official Translation 824, 825) (1973) (explaining that the heirs of a person who died through another's negligence have claims both for their own suffering and the suffering of the decedent).

■ 2. *Excessiveness.* HSF's final storming of the barricades consists of a frontal attack on the amount of the jury's award and a flanking attack on Judge Perez–Gimenez's decision not to trim it. Both determinations are reviewable under an abuse-of-discretion rubric. *See, e.g., Segal v. Gilbert Color Sys., Inc.*, 746 F.2d 78, 81 (1st Cir. 1984).

■ This aspect of the case centers around the size of the aggregate damage award. Excessiveness, like beauty, is often in the eye of the beholder. Accordingly, the case law instructs that a damage award must endure unless it is "grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand." *Id.* at 80–81 (quoting *Grunenthal v. Long Island R.R. Co.*, 393 U.S. 156, 159 & n. 4, 89 S.Ct. 331, 333 & n. 4, 21 L.Ed.2d 309 (1968); internal quotation marks omitted). An appellate court's normal disinclination to second-guess a jury's evaluation of the proper amount of damages is magnified where, as here, the damages entail a monetary valuation of intangible losses, and the trial judge, having seen and heard the witnesses at first hand, accepts the jury's appraisal. *See Ruiz v. Gonzalez Caraballo*, 929 F.2d 31, 34 (1st Cir.1991).

■ Measured by this standard, the verdicts in favor of the survivors are beyond reproach. Puerto Rico law permits certain close relatives to bring suits of this type without requiring a showing of physical injury or economic loss. *See P.R.Laws Ann. tit. 31, § 5141 (1990); see also LaForest v. Autoridad de Las Fuentes Fluviales*, 536 F.2d 443, 444–45 (1st Cir.1976) (applying Puerto Rico law and allowing wrongful death action by the decedent's parents and siblings);

*Burke v. Compagnie Nationale Air France*, 699 F.Supp. 1016, 1018 (D.P.R.1988) (explaining that, under Puerto Rico's Civil Code, "mental suffering is generally just as compensable as physical harm").

Here, the plaintiffs presented both lay testimony and expert opinion evidence regarding their pain, suffering, and mental anguish (past, present, and future). The testimony indicated that the decedent was a matriarchal figure who functioned as the hub of the family circle. Her son, Angel, lived with her; her two daughters, Gloria and Esther, resided nearby; her deceased son's four children—who lost their father a mere five months before their grandmother perished—dwelt in her home for much of their lives. The plaintiffs' expert testified that all three of Ms. Gonzalez's children suffered depression in the wake of their mother's death; and that the four grandchildren experienced sadness, suffering and the like that would take up to five years to abate.

At trial, HSF neither rebutted this testimony in kind nor effectively impeached it. On appeal, HSF sends up a smoke screen, resorting to highly questionable practices. Citing authority out of context, and neglecting to insert ellipses to signify textual omissions—its citation of *Ruiz*, 929 F.2d at 34, as "authority" for a proposition exactly the opposite of what the case holds is a prime example—HSF strains to carry the heavy burden inherent in challenging a jury's award of damages for noneconomic loss. We find its argument to be both disingenuous and unpersuasive.

■ Objectively considered, the record easily supports the jury's assessment of damages in favor of the offspring. It is hard to doubt that the plaintiffs suffered when the woman described by one witness as the trunk of the family tree was cut down. The open question involves the difficult chore of translating their pain, suffering, and anguish into dollars. This is a matter largely within the jury's ken. *See id.* Taking into account the expert's testimony and the evidence of the close-knit family structure, the sums awarded do not shock—or even vellicate—our collective conscience.

This leaves the $200,000 awarded to the heirs on account of Ms. Gonzalez's pain and suffering. Though generous, the jury's assessment does not outstrip the bounds of reason. Due to the Hospital's failure to provide even the most rudimentary screening, Ms. Gonzalez spent the few remaining hours of her life in agony, beset by nausea, dizziness, and chest pains. It is hard to imagine—let alone to quantify in dollars—the sheer terror that she must have felt while waiting for medical attention that never came.

Although HSF mounts a series of arguments crafted to cast doubt upon the size of the verdict, these arguments are unpersuasive. This case, in which the decedent's travails extended over a period of several hours, is unlike cases involving sudden death in which a decedent's pain and suffering is limited to a few seconds or, at most, a matter of minutes. *See, e.g., Bonn v. Puerto Rico Int'l Airlines, Inc.*, 518 F.2d 89, 94 (1st Cir.1976). By like token, merely showing that the damage award is generous in comparison to other (hand-picked) cases is insufficient to warrant relief. *See Havinga v. Crowley Towing & Transp. Co.*, 24 F.3d 1480, 1488–89 (1st Cir.1994). Finally, it is beside the point that judges in the commonwealth courts frequently award lesser sums in wrongful death actions. While EMTALA refers to local law to determine the scope of damages, *see* 42 U.S.C. § 1395dd(d)(2), this requirement does not override the general rule that "[a] federal jury . . . is not bound in making its determination by the amount that the Commonwealth courts have awarded or approved." *LaForest*, 536 F.2d at 446–47.

To recapitulate, converting feelings such as pain, suffering, and mental anguish into dollars is not an exact science. The jury is free "to harmonize the verdict at the highest or lowest points for which there is a sound evidentiary predicate, or anywhere in between . . . so long as the end result does not . . . strike such a dissonant chord that justice would be denied were the judgment permitted to stand." *Milone v. Moceri Family,*

*Inc.*, 847 F.2d 35, 37 (1st Cir.1988). Here, we do not find the damages assigned by the jury to cross the outer limit of the wide universe of acceptable awards. In sum, the damage award in the heirs' favor is neither legally inappropriate nor so excessive as to necessitate a remittitur.[10]

## V. CONCLUSION

We need go no further. HSF has not presented arguments capable of overcoming the formidable hurdles it faces in challenging either the liability determination or the damage assessment of a properly instructed jury. The judgment below must therefore be

*Affirmed.*

### APPENDIX

#### EMTALA Excerpts

In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under [Medicare] ), comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1) of this section) exists.

42 U.S.C. § 1395dd(a).

If any individual (whether or not eligible for benefits under [Medicare] ) comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either—

> (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or

10. Our endorsement of the damages, including the award to the heirs for the decedent's pain and suffering, is fortified by the trial judge's unconditional seal of approval. *See Ruiz*, 929 F.2d at 34.

(B) for transfer of the individual to another medical facility in accordance with subsection (c) of this section.

42 U.S.C. § 1395dd(b)(1).

If an individual at a hospital has an emergency medical condition which has not been stabilized (within the meaning of subsection (e)(3)(b) of this section), the hospital may not transfer the individual unless—

(A)(i) the individual (or a legally responsible person acting on the individual's behalf) after being informed of the hospital's obligations under this section and of the risk of transfer, in writing requests transfer to another medical facility [, or]

(ii) a physician ... has signed a certification that based upon the information available at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual ... and

(B) the transfer is an appropriate transfer ... [as defined *infra*].

42 U.S.C. § 1395dd(c)(1).

An appropriate transfer to a medical facility is a transfer—

(A) in which the transferring hospital provides the medical treatment within its capacity which minimizes the risks to the individual's health ...;

(B) in which the receiving facility—

(i) has available space and qualified personnel for the treatment of the individual, and

(ii) has agreed to accept transfer of the individual and to provide appropriate medical treatment;

(C) in which the transferring hospital sends to the receiving facility all [relevant] medical records ...; [and]

(D) in which the transfer is effected through qualified personnel and transportation equipment, as required including the use of necessary and medically appropriate life support measures during the transfer....

42 U.S.C. § 1395dd(c)(2).

A participating hospital that negligently violates a requirement of this section is subject to a civil monetary penalty of not more than $50,000 ... for each such violation.

42 U.S.C. § 1395dd(d)(1)(A).

Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate.

42 U.S.C. § 1395dd(d)(2)(A).

The term "emergency medical condition" means ...

(A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—

(i) placing the health of the individual ... in serious jeopardy,

(ii) serious impairment to bodily functions, or

(iii) serious dysfunction of any bodily organ or part....

42 U.S.C. § 1395dd(e)(1)(A).

A participating hospital may not delay provision of an appropriate medical screening examination required under subsection (a) of this section or further medical examination and treatment required under subsection (b) of this section in order to inquire about the individual's method of payment or insurance status.

42 U.S.C. § 1395dd(h).