# United States Court of Appeals

## For the First Circuit

_____

No. 99-2153

CINDY REYNOLDS, INDIVIDUALLY, AND AS
PERSONAL REPRESENTATIVE OF THE ESTATE
OF WILLIAM D. REYNOLDS; TINA MOORE, AS NEXT
FRIEND OF KELLIANN RAE REYNOLDS, A MINOR;
Plaintiffs, Appellants,

v.

MAINEGENERAL HEALTH,
Defendant, Appellee.

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. Eugene W. Beaulieu, U.S. Magistrate Judge]

_____

Before

Torruella, Chief Judge,

Lipez, Circuit Judge,

and Keeton,* District Judge.

_____

Joseph M. Jabar, with whom Daviau, Jabar & Batten and David M.
Glasser were on brief, for appellants.
George C. Schelling, with whom Gross, Minsky, Mogul & Singal, P.A.
was on brief, for appellee.

_____

* Of the District of Massachusetts, sitting by designation.

_____

July 17, 2000

_____

**KEETON, District Judge.** This appeal requires us to interpret the scope of coverage under the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd, for secondary risks associated with emergency conditions. After reviewing the record in light of the statutory scheme, we affirm the district court's summary judgment in favor of defendant-appellee MaineGeneral Health.

## I.  The Facts

Because we are reviewing the district court's summary judgment in favor of defendant-appellee, we recite the facts in the light most favorable to the plaintiffs-appellants. See Fed. R. Civ. P. 56.

On September 8, 1996, William D. Reynolds was driving a car that collided head-on with another vehicle.  As a result of the accident, Mr. Reynolds suffered various injuries including several fractures of bones in his lower right leg and left foot.  Mr. Reynolds was taken immediately by ambulance from the accident scene to the emergency room of Kennebec Valley Medical Center (now known as the MaineGeneral Medical Center and referred to throughout this opinion for convenience as "MaineGeneral" or the "hospital").  After an emergency room nurse had triaged Mr. Reynolds, he was examined by Dr. Harry Grimmnitz, the emergency room physician.  Dr. Grimmnitz evaluated Mr. Reynolds, took an oral medical history, and ordered a series of laboratory tests, x-rays, and an abdominal CT scan.  After considering

-3-

this information, Dr. Grimmnitz determined that Mr. Reynolds suffered from multiple trauma to his lower right leg, including a probable open fracture of the right tibia and fibula and possible fracture of the left foot, and from a possible intra-abdominal injury.

Dr. Grimmnitz then requested consultations from Dr. Alexander Wall, a surgeon, and Dr. Anthony Mancini, an orthopedic surgeon. Dr. Wall reported slight right upper quadrant tenderness with a negative CT scan of the abdomen. Dr. Mancini examined Mr. Reynolds in the emergency room and took another oral medical history. Dr. Mancini determined that the injuries to Mr. Reynolds' lower extremities required surgery. Mr. Reynolds was transferred to the operating room where Dr. Mancini performed a closed reduction and intramedullary rodding of the right tibia fracture and a closed reduction and percutaneous pinning of the left second, third, and fourth metatarsal neck and head fractures. Following surgery, Mr. Reynolds was admitted to the hospital floor, where the hospital staff monitored his condition and he began receiving physical therapy.

On September 13, 1996, Mr. Reynolds was returned to the operating room for closure of his right lower leg wound. On September 14, 1996, he was discharged from the hospital. On September 19, 1996, he died of a massive pulmonary embolism that emanated from deep veinous thrombosis ("DVT") at the fracture site on his right leg.

Plaintiffs proffered the affidavit of Mr. Reynolds' mother-in-law, Shirley Kimball, who was in the emergency room at MaineGeneral after the accident but before Mr. Reynolds had surgery. Ms. Kimball states that she saw a man in a white lab coat ask Mr. Reynolds if he had any allergies or medical problems of which the hospital should be aware. Ms. Kimball alleges that Mr. Reynolds told the man "that his family had a blood clotting problem on his father's and brothers' side of the family whenever they had a trauma." Appendix to Appellants' Brief at 130.

Plaintiffs proffered the affidavits of several family members, each of whom alleges that he or she told a MaineGeneral employee in the hospital room after Mr. Reynolds underwent surgery that Mr. Reynolds had a family history of hypercoagulability.

## II.  Procedural Background

On September 8, 1998, plaintiff-appellant Cindy Reynolds, widow of the decedent William D. Reynolds, filed a complaint in the United States District Court for the District of Maine in her personal capacity and as the personal representative of the Estate of the decedent. Mr. Reynolds' minor daughter, Kelliann Reynolds, is also a plaintiff-appellant. The complaint alleged that Mr. Reynolds presented to the emergency department at MaineGeneral on September 8, 1996, with an emergency medical condition as defined by EMTALA, 42 U.S.C. § 1395dd(e)(1); that MaineGeneral failed to screen Mr. Reynolds

appropriately for DVT, as required under 42 U.S.C. § 1395dd(a); and that MaineGeneral failed to stabilize Mr. Reynolds for DVT before releasing him on September 14, 1996, thus violating the requirements of 42 U.S.C § 1395dd(b).

In a memorandum of decision dated September 8, 1999, Magistrate Judge Beaulieu granted defendant-appellee's motion for summary judgment, having concluded that the facts did not support a federal claim for failure to screen under EMTALA even though they supported a state-law claim for negligent diagnosis and treatment. Magistrate Judge Beaulieu further held that plaintiffs' claim for failure to stabilize fails as a matter of law because the hospital was not aware that Mr. Reynolds was suffering from DVT. Plaintiffs filed their notice of appeal to this court on October 6, 1999.

### III.  Merits of the Appeal

**A.  Screening Claim**

At issue in this case is the precise scope of a participating hospital's duty to screen for risks or related conditions associated with or aggravated by an emergency medical condition. In this instance, MaineGeneral does not dispute that William Reynolds suffered from an emergency medical condition at the time he arrived in the emergency room. The parties agree that the injuries to Mr. Reynolds' lower extremities constituted an emergency medical condition requiring appropriate screening and stabilization before discharge or transfer.

-6-

In dispute is the answer to the following question: Does the increased risk of DVT associated with this type of injury, combined with Mr. Reynolds' family history of hypercoagulability, trigger a duty to screen for DVT?

Appellants argue that the risk of DVT constituted a discrete "emergency medical condition," which required screening and stabilization under EMTALA, just as the fractures of the lower extremities required screening and stabilization. Appellee contends that the increased risk of DVT was not an "emergency medical condition" within the meaning of EMTALA and did not require particularized screening or stabilization. Appellee argues generally that risks and conditions associated with or following from emergency medical conditions that do not constitute independent "emergency medical conditions" within the meaning of EMTALA will not fall within the requirements of EMTALA. In evaluating these arguments, we consider three analytically separable propositions.

First. Appellants' first argument is premised on a meaning of "symptom" that we cannot accept. Appellants argue that summary judgment was not appropriate because Mr. Reynolds was exhibiting symptoms of an emergency medical condition – DVT – when he came to the emergency room. Appellants contend that this court should interpret the word "symptom" in EMTALA's definition of "emergency medical condition" to include any evidence or communication of information that

an emergency medical condition may exist. Appellants allege first that injuries to the lower extremities such as those suffered by Mr. Reynolds create a substantial risk of the development of DVT. They contend that the knowledge that Mr. Reynolds' injuries indicated a risk of DVT should be construed as a "symptom" under EMTALA, warranting further screening and stabilization. Appellants argue alternatively that Mr. Reynolds' alleged statement that he had a family history of hypercoagulability, combined with the particular injuries, constituted a "symptom" of an emergency medical condition. The hospital's failure to screen when confronted with these symptoms of DVT, appellants aver, violates EMTALA's screening requirement.

Appellants' proposed interpretation of "symptoms" is contrary to ordinary usage, not supported by statutory text or purpose, and not supported in caselaw.

EMTALA defines "emergency medical condition" as follows, in pertinent part:

> (A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in–
> > (i) placing the health of the individual . . . in serious jeopardy,
> > (ii) serious impairment to bodily functions, or
> > (iii) serious dysfunction of any bodily organ or part
> . . . .

42 U.S.C. § 1395dd(e)(1). Appellee argues that information about family history provided by a patient, without any accompanying

-8-

psychological or physiological symptoms, cannot reasonably be understood to be an "acute symptom[] of sufficient severity" that is "manifest[ed]" by a "medical condition."

We need not and do not adopt this more circuitous path of reasoning instead of the direct inference that the words of the statute, in their literal context, do not support appellants' proposed meanings of "symptoms."

Caselaw provides no clear answer to the issue of statutory interpretation before us.

A patient who communicates that she feels nauseous or dizzy could be describing a symptom of an emergency medical condition. See Correa v. Hospital San Francisco, 69 F.3d 1184, 1192 (1st Cir. 1995) ("[N]ausea and dizziness ... might well herald the onset of an emergency medical condition in the case of a hypertensive diabetic."). In such a case the condition manifests itself by the dizziness or nausea, a symptom that is then communicated verbally by the patient. Information about risk-factors, such as injuries or medical history, would inform a physician's interpretation of that symptom. Nausea and dizziness alone do not necessarily indicate that an emergency medical condition exists but, when coupled with a history of hypertension and diabetes, as in Correa, may indicate the presence of an emergency medical condition. Several important differences exist, however, between the facts of this case and those of Correa. First, the patient

-9-

in Correa was at the time of the examination experiencing physiological symptoms of a pathological condition, symptoms that were communicated to the staff of the emergency department. Here, Mr. Reynolds was not experiencing any physiological symptoms of DVT that he expressed to anyone at MaineGeneral. Also, the patient in Correa came to the emergency room complaining of these symptoms and received no screening or treatment for any condition that she may have had. Here, Mr. Reynolds was brought to the emergency room with significant trauma to his lower legs for which he received extensive screening and treatment. Although appellants ask us to accept as compelling an analogy between the absence of any screening and treatment in Correa and the lack of screening and treatment for DVT here, we find this argument unpersuasive.

Second. Appellants claim that a court (including this court) should hold in this case that, for purposes of applying EMTALA's screening requirement, Mr. Reynolds came to the emergency department twice.

Appellants cite López-Soto v. Hawayek, 175 F.3d 170 (1st Cir. 1999), to support the proposition that the duty to screen does not arise only at the moment a patient first comes to the emergency room, but may arise later in the face of new information or changed circumstances. Appellants materially misread this court's holding in López-Soto. The circumstances in López-Soto involved a woman who came

-10-

to the hospital to deliver her baby and was admitted to the maternity ward. Problems developed during delivery and the child was born in severe respiratory distress and later died after being transferred to a different hospital. Defendant in López-Soto argued that the infant did not "[come] to the emergency room" and that the hospital, therefore, was not under an obligation to stabilize his emergency medical condition before transferring him to another hospital. In ruling against defendant, this court determined that subsection (a) and subsection (b) of 42 U.S.C. § 1395dd are to be read disjunctively. See id. at 173. That is, the phrase "comes to the emergency room" relates only to the duty to screen embodied in subsection (a). Subsection (b), on the other hand, provides that if any individual "comes to a hospital" and the hospital determines that the individual has an emergency medical condition, the hospital has a duty to stabilize that condition. In López-Soto the court concluded that the duty to stabilize before transfer attaches "as long as an individual enters any part of the hospital and the hospital determines that an emergency medical condition exists." Id. at 174 (citation omitted). Because the court clearly distinguished the requirements imposed by subsection (a), which are triggered by a patient's coming to the emergency department, from those imposed by subsections (b) and (c), which are triggered by a patient's coming to the hospital, appellants' reliance on López-Soto is misplaced.

Appellants try a somewhat different, but related, tack in arguing that the hospital room should be treated as the functional equivalent of the emergency department for purposes of this case. Appellants acknowledge that the need to treat immediately the traumatic injuries to Mr. Reynolds' lower extremities postponed full screening for and treatment of DVT until after Mr. Reynolds' traumatic injuries had been treated. Appellants also note that Mr. Reynolds may not have had DVT when he first arrived at MaineGeneral, but may have developed DVT while at the hospital. They propose that because of these circumstances, the duty to screen should be tolled, in effect, until after the traumatic injuries had been treated and clotting was more likely to have begun. Appellants argue that it would be unreasonable for this court to interpret 42 U.S.C. § 1395dd(a) in a way that requires Mr. Reynolds to leave the hospital and reenter the emergency room a second time in order to receive screening and treatment for potential DVT. Not only does the text of the statute fail to support appellants' contention, but neither does the purpose of the statute as manifested by Congress.

As numerous courts have noted, including this one, "EMTALA is a limited 'anti-dumping' statute, not a federal malpractice statute." Bryan v. Rectors and Visitors of the Univ. of Va., 95 F.3d 349, 351 (4th Cir. 1996) (citation omitted); see Correa, supra, 69 F.3d at 1192; Summers v. Baptist Med. Ctr. Arkadelphia, 91 F.3d 1132, 1137

-12-

(8th Cir. 1996) ("So far as we can tell, every court that has considered EMTALA has disclaimed any notion that it creates a general federal cause of action for medical malpractice in emergency rooms."); Urban v. King, 43 F.3d 523, 525 (10th Cir. 1994). Congress enacted EMTALA in 1996, in the face of "the increasing number of reports that hospital emergency rooms are refusing to accept or treat patients with emergency conditions if the patient does not have medical insurance." H.R. Rep. No. 241(I), 99th Cong., 1st Sess. 27 (1986), reprinted in 1986 U.S.C.C.A.N. 42, 605. EMTALA created a remedy for patients in certain contexts in which a claim under state medical malpractice law was not available. Although the exact scope of the rights guaranteed to patients by EMTALA is still not fully defined, it is clear that at a minimum Congress manifested an intent that all patients be treated fairly when they arrive in the emergency department of a participating hospital and that all patients who need some treatment will get a first response at minimum and will not simply be turned away. See Baber v. Hospital Corp. of America, 977 F.2d 872, 880 (4th Cir. 1992) ("The avowed purpose of EMTALA was not to guarantee that all patients are properly diagnosed, or even to ensure that they receive adequate care, but instead to provide an 'adequate first response to a medical crisis' for all patients and 'send a clear signal to the hospital community . . . that all Americans, regardless of wealth or status, should know that a hospital will provide what services it can when they are truly

-13-

in physical distress.'") (<u>quoting</u> 131 Cong. Rec. S13904 (Oct. 23, 1985) (statement of Sen. Durenberger)). Appellants' argument that because Mr. Reynolds was in a hospital room receiving treatment for his injuries when the risk of DVT became manifest, it would be unreasonable to deny him the protections of subsection (a) is unpersuasive. The fact that Mr. Reynolds was in the hospital receiving treatment is a <u>prima</u> <u>facie</u> showing that the purpose of subsection (a) was satisfied; any failures of diagnosis or treatment were then remediable under state medical malpractice law.

<u>Third</u>. Appellants argue that MaineGeneral screened Mr. Reynolds differently than it did other patients exhibiting similar symptoms. Appellants contend that a complete medical history, under MaineGeneral's hospital policy, includes questioning patients concerning any family history of hypercoagulability. They aver that because Mr. Reynolds was not asked questions about his family history of blood-clotting, he received disparate treatment.

Appellants proffered evidence that MaineGeneral's only written policy regarding the taking of medical histories from patients required that a "complete history" be taken from all patients. Appellants proffered expert testimony to support the proposition that a "complete history" in Mr. Reynolds' context necessarily included asking questions about any family history of hypercoagulability. Appellants aver that this expert testimony, in conjunction with the

-14-

absence of any more detailed hospital policies, compels an inference that MaineGeneral gave disparate treatment to Mr. Reynolds when it did not ask him questions concerning his family history of hypercoagulability.

Appellants' argument attempts again to bring a malpractice standard into the interpretation and application of a statute designed to complement and not incorporate state malpractice law.  To recover for disparate treatment, appellants must proffer evidence sufficient to support a finding that Mr. Reynolds received materially different screening than that provided to others in his condition.  It is not enough to proffer expert testimony as to what treatment *should* have been provided to a patient in Mr. Reynolds' condition.  Appellants have not proffered evidence sufficient to support a finding that Mr. Reynolds received materially different screening than did other patients in his condition.

Insofar as appellants are continuing to make a general case for interpreting EMTALA as providing a federal-law remedy for any inappropriate treatment in a hospital to which a patient in need of emergency attention is brought, this attempt fails for the reasons explained above.  In <u>Correa</u>, this court recognized appropriate emergency screening as the EMTALA objective and sketched out the contours of appropriate screening under EMTALA:

> A hospital fulfills its statutory duty to screen patients in its emergency room if it provides for a screening examination reasonably calculated to identify critical medical conditions that may be afflicting *symptomatic* patients and provides that level of screening uniformly to all those who present substantially similar complaints. . . . The essence of this requirement is that there be some screening procedure, and that it be administered even-handedly.

Correa, 69 F.3d at 1192 (emphasis added) (internal citations omitted).

Because we conclude, based on the record before us, that appellants failed to proffer evidence sufficient to support a finding that Mr. Reynolds was "symptomatic" for DVT, within the meaning of the statute, the hospital was not required under the statute to screen for DVT.

## B.  Stabilization Claim

In addition to their claim for failure to screen Mr. Reynolds appropriately for DVT, appellants argue that a genuine dispute of material fact exists as to whether MaineGeneral stabilized Mr. Reynolds for DVT before releasing him.  Appellants argue extensively about the nature of the stabilization requirements under EMTALA in support of their contention that Mr. Reynolds was not stabilized before release. A critical flaw in this claim of appellants under § 1395dd(b)(1), however, is that appellants have failed to demonstrate that Mr. Reynolds had an emergency medical condition at the time of his discharge from MaineGeneral.

As a corollary to the right to be appropriately screened, EMTALA guarantees patients the right, if an emergency medical condition

-16-

is determined to exist, to have that condition stabilized before discharge or transfer to another hospital.  The statute provides, in pertinent part:

> If any individual . . . comes to a hospital and the hospital *determines that the individual has an emergency medical condition*, the hospital must provide either–
>     (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or
>     (B) for transfer of the individual to another medical facility in accordance with subsection (c).

42 U.S.C. § 1395dd(b)(1) (emphasis added).  This court need not reach any questions about the nature of stabilization if we determine that the predicates to stabilization have not been satisfied.  Appellants proffered expert testimony that it was likely that the clot that later became the pulmonary embolism that caused Mr. Reynolds' death formed before Mr. Reynolds was discharged from MaineGeneral.  Appellants' expert further testified that a 17 to 30% likelihood existed that Mr. Reynolds had formed blood clots at the time of his discharge.  Appellants' expert also proffered testimony that some research indicates a 2% mortality rate in cases of untreated DVT.  Evidence of one expert that it is more likely than not in his opinion that the blood clot that eventually caused Mr. Reynolds' death had formed by the time of his discharge, combined with the evidence that 2% of untreated DVT cases result in death, is not sufficient to support a determination that Mr. Reynolds had an emergency medical condition at the time of his

-17-

discharge.  To invoke subsection (b), appellants must proffer more than evidence of a possibility of the existence of a blood clot at the time of Mr. Reynolds' discharge.  They must proffer evidence sufficient to support a finding, reasoned from evidence, that an emergency medical condition, within the meaning of the statute, was already in existence at the time of Mr. Reynolds' discharge.  Appellants have not proffered evidence sufficient to support a finding that Mr. Reynolds had an emergency medical condition at that time, and for this reason have failed to satisfy a necessary predicate to the duty to stabilize.

Furthermore, as noted by Magistrate Judge Beaulieu, appellants' case is centered on the asserted fact that MaineGeneral did not take steps to determine whether Mr. Reynolds was at risk of developing DVT.  It is doubtful that the text of the statute would support liability under the stabilization provision for a patient who had DVT, absent evidence sufficient to support a finding that the hospital knew of his DVT.  See Marshall v. East Carroll Parish Hosp. Serv. Dist., 134 F.3d 319, 325 (5th Cir. 1998); Summers, supra, 91 F.3d at 1140 (no duty to stabilize unless hospital "has actual knowledge of the individual's unstabilized emergency medical condition"); Vickers v. Nash Gen. Hosp., Inc., 78 F.3d 139, 145 (4th Cir. 1996) ("The Act does not hold hospitals accountable for failing to stabilize conditions of which they are not aware, or even conditions of which they should have been aware.").  It appears quite likely that one important respect in

which EMTALA's requirements are narrower than those imposed by state law concerns prophylactic care. Subsection (b) requires stabilization of only those conditions that a participating hospital has determined to be emergencies. It may be that in exceptional circumstances of proof of an existing emergency need for immediate stabilization, a hospital would have a duty of stabilization under EMTALA. We need not and do not reach that issue, however, since it is not presented by the record before us in this case.

## IV.  Conclusion

Because appellants' claims essentially are claims that MaineGeneral misdiagnosed and negligently treated William Reynolds, we believe the district court appropriately granted defendant's motion for summary judgment on plaintiffs' EMTALA claims. For the reasons stated in this opinion, the judgment of the district court is **AFFIRMED.**