Providencia **ALVAREZ–TORRES,** et al., Plaintiffs,

v.

**RYDER MEMORIAL HOSPITAL, INC., et al., Defendants.**

**Civil No. 03–1041 (FAB).**

United States District Court, D. Puerto Rico.

Sept. 19, 2008.

Jose Luis Ubarri–Garcia, David W. Roman, Diana L. Pagan–Rosado, Brown & Ubarri, San Juan, PR, for Plaintiffs.

Teresa M. Garcia–Moll, Teresa M. Garcia Moll Law Office, Igor Dominguez–Perez, Igor J. Dominguez, Law Office, Jose A. Gonzalez–Villamil, Gonzalez Villamil Law Office, Jose O. Ramos–Gonzalez, Ramos

Gonzalez & Toyos Olascoaga, Jose A. Miranda–Daleccio, Pedro J. Cordova–Pelegrina, Miranda Cardenas & Cordova, Luis R. Ramos–Cartagena, Gonzalez, Castaner & Morales Cordero, CSP, San Juan, PR, for Defendants.

## OPINION AND ORDER

BESOSA, District Judge.

At a pre-trial conference on September 19, 2007, the parties discussed whether the Court had jurisdiction to hear the case considering alleged deficiencies in the plaintiffs' claim under the Emergency Medical Treatment and Active Labor Act ("EMTALA") (Docket No. 189). The Court then ordered the defendants to file a motion for summary judgment on this issue (*Id.*). Defendant Ryder Memorial Hospital ("Ryder") filed its motion for summary judgment on September 18, 2007 (Docket No. 179). The hospital's motion was joined by co-defendants Dr. Enrique Ortiz–Kidd, Triple S, the Conjugal Partnership of Dr. Enrique Ortiz–Kidd, Sindicato de Aseguradores de Impericia Medico Hospitalaria ("SIMED"), and Juan Ramon Gomez–Lopez (Docket Nos. 187, 188 & 190). Plaintiffs opposed defendants' motion for summary judgment on November 9, 2007 (Docket No. 206).

For the reasons stated below, the Court hereby **GRANTS** defendants' joint motion for summary judgment.

## I. Background

Adalberto Martinez Lopez ("Martinez Lopez"), a fifty-seven year old, end-stage renal disease dialysis patient, with high blood pressure and hepatitis C, arrived at Ryder's Emergency Room complaining of bleeding from a femoral dialysis catheter and chest pain at approximately 6:45 PM on January 16, 2001. His vital signs were recorded as a temperature of 36.5, a pulse of 68, a respiratory rate of 23, and blood pressure of 200/70.

Dr. Griselle Pastrana ("Pastrana") examined Martinez Lopez in the Emergency Room ("ER") at 6:50 PM. She recorded that Martinez Lopez was bleeding from the catheter site, that he felt weak and dizzy, and that he had a hemoglobin level of 6.5. She also recorded that the patient was alert, "oriented", mildly pale, and chronically ill. His lungs were clear to auscultation. The heart had a regular rhythm and no murmur. Pastrana entered the following orders: CBC with differential-STAT, Hematocrits–STAT, SMA, Arterial Blood Gases–STAT, oxygen by nasal canula at three liters per minute, Chest x-ray portable, EKG, ProTime, PTT/INR, Cardiac enzymes, liver profile, and type and cross (match) for four units of packed red blood cells.

At 7:30 PM, Dr. Enrique Ortiz–Kidd ("Ortiz–Kidd") ordered the admission of Martinez Lopez to the hospital under his supervision after he spoke with Pastrana. At approximately 7:39 PM, Martinez Lopez was admitted to Ryder's Medicine Floor. He was placed under the care of Ortiz–Kidd with the following orders: blood transfusions with dialysis the following day, strict bed rest, renal diet, vital signs each four hours, type and cross for four units of Packed Red Blood Cells ("PRBC"), arterial blood gases, CBC and differential, SMA7, cardiac enzymes, PT/PTT/INR, Liver Profile, Oxygen by nasal canula at three liters per minute, hemodialysis the following morning, a transfusion of PRBC during hemo-dialysis with dialyzer F 8 (no heparin), chest plate (portable), electrocardiogram and Norvasc 5 mg (for blood pressure). Martinez Lopez was not assigned a room until 9:00 pm. He reached that room, number 309, at 9:30 PM. At that time it was documented that the hospital admitted him because of bleeding from his graft. It was further documented that he was pale, alert, fever-

ish with edema, weak, and suffering from slight respiratory distress and chest pain.

At 10:00 PM, Martinez Lopez remained feverish. Nurses contacted the on-duty nephrologist and him appraised him about Martinez Lopez's temperature and blood pressure, which stood at 160/70. Twenty minutes later, Dr. Baquero prescribed Martinez Lopez two 500mg Tylenol tablets, heparin lock, vancomycin (an antibiotic), and ordered a blood culture. Sometime after 11:00 PM Martinez Lopez's bandages were changed. Then, fifteen minutes after midnight, Ortiz–Kidd telephoned the following order: apply pressure to the area that is bleeding and change the bandage; (2) apply an NSS .9 over the incision area; and (3) type and cross for four units of frozen plasma to transfuse in the morning with dialysis. During the 11:00 PM to 7:00 AM nursing shift, Martinez Lopez continued to have "lots of bleeding" in the area of the incision. His bandages were changed on several occasions.

At 4:55 AM a relative of Martinez Lopez informed a nurse that he continued to bleed profusely. Ortiz–Kidd was then contacted. He ordered a consultation with a surgeon, Dr. Sotomayor, and that pressure be applied to the area. At 5:00 AM, Martinez Lopez continued to bleed. He had the following vital signs: blood pressure 100/60, pulse 90, respiratory rate 24, and temperature 37. The nurse supervisor was called because of Martinez Lopez's continued bleeding, and she was told that an ER physician should see the patient. Subsequently, co-defendant Juan R. Gomez Lopez ("Gomez Lopez") visited Martinez Lopez. Gomez Lopez ordered a transfusion of four units of fresh frozen plasma after evaluating Martinez Lopez, discussed the patient's condition with Ortiz–Kidd, and informed Ortiz–Kidd that Sotomayor was not on duty.

At 5:30 AM, Ortiz–Kidd called and requested a consultation with Dr. Canetti. The nurses called Dr. Canetti who said he would come to evaluate the patient. The lab reported at this time that it had frozen plasma available. At 5:35 AM the patient was administered two 500 mg tablets of acetaminophen tablets and a transfusion of platelets, in accordance with an order from Dr. Gomez. The patient's body temperature was 39 degrees at this time. At 6:45 AM the patient was reported to be in grave condition; he continued to bleed profusely. New bandages were placed and pressure applied to the wound. At 7:00 AM, Dr. Canetti examined Martinez Lopez. He noted that Martinez Lopez was acutely ill but not bleeding at that moment. He also ordered the transfer of Martinez Lopez as soon as possible to Auxilio Mutuo to repair Martinez Lopez's broken fistula. Five minutes later, at 7:05 AM, Ortiz–Kidd was notified of Dr. Canetti's order. At that time Martinez Lopez was reported to be in a delicate condition, and a transfusion of fresh frozen plasma platelets may have begun.

During nursing rounds, at some point between 7:00 AM and 8:00 AM, Martinez Lopez was found not breathing. Martinez Lopez was then connected to a monitor and CPR was performed to no avail. He was pronounced dead at 8:15 AM.

## II. Summary Judgment Standard

The Court's discretion to grant summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. The Rule states, in pertinent part, that the court may grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

FED.R.CIV.P. 56(c); *see also Santiago–Ramos v. Centennial P.R. Wireless Corp.,* 217 F.3d 46, 52 (1st Cir.2000). The party moving for summary judgment bears the burden of showing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once a properly supported motion has been presented, the opposing party has the burden of demonstrating that a trial-worthy issue exists that would warrant the court's denial of the motion for summary judgment. For issues where the opposing party bears the ultimate burden of proof, that party cannot merely rely on the absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute. *See Suarez v. Pueblo Int'l, Inc.,* 229 F.3d 49, 53 (1st Cir.2000).

In order for a factual controversy to prevent summary judgment, the contested facts must be "material" and the dispute must be "genuine." Material means that a contested fact has the potential to change the outcome of the suit under governing law. The issue is genuine when a reasonable jury could return a verdict for the nonmoving party based on the evidence. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It is well-settled that "[t]he mere existence of a scintilla of evidence" is insufficient to defeat a properly supported motion for summary judgment. *Id.* at 252, 106 S.Ct. 2505. It is therefore necessary that "a party opposing summary judgment must present definite, competent evidence to rebut the motion." *Maldonado–Denis v. Castillo–Rodriguez,* 23 F.3d 576, 581 (1st Cir.1994).

In making this assessment, the court "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging in all reasonable inferences in that party's favor."

*Griggs–Ryan v. Smith,* 904 F.2d 112, 115 (1st Cir.1990). The court may safely ignore, however, "conclusory allegations, improbable inferences, and unsupported speculation." *Medina–Muñoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990).

### III. Discussion

#### A. EMTALA

##### 1. Screening

The Emergency Medical Treatment and Active Labor Act ("EMTALA" or the "Act") requires covered hospitals to screen any visitor to a hospital emergency room for an emergency medical condition and to stabilize visitors suffering from an emergency condition prior to transferring or releasing that visitor. 42 U.S.C. § 1395dd; *del Carmen Guadalupe v. Negron Agosto,* 299 F.3d 15, 19–23 (1st Cir. 2002); *Reynolds v. MaineGeneral Health,* 218 F.3d 78, 81–85 (1st Cir.2000); *Lopez–Soto v. Hawayek, M.D.,* 175 F.3d 170, 172–77 (1st Cir.1999); *Correa v. Hospital San Francisco,* 69 F.3d 1184, 1189–90 (1st Cir. 1995) cert. denied, 517 U.S. 1136, 116 S.Ct. 1423, 134 L.Ed.2d 547 (1996). In this case plaintiffs raise separate claims under both the screening, 42 U.S.C. § 1395dd(a), and stabilization, 42 U.S.C. § 1395dd(b)-(c), provisions of the Act.

"Congress enacted EMTALA in 19[8]6, in the face of 'the increasing number of reports that hospital emergency rooms are refusing to accept or treat patients with emergency conditions if the patient does not have medical insurance.'" *Reynolds,* 218 F.3d at 83 (quoting H.R.Rep. No. 241(I), 99th Cong., 1st Sess. 27 (1986), *reprinted in* 1986 U.S.C.C.A.N. 42, 605). The Act created a remedy for patients in certain contexts where a remedy was not available under state medical malpractice law. *Id.*; *see Summers v. Baptist Medical Center Arkadelphia,* 91 F.3d 1132, 1137

(8th Cir.1996). "The avowed purpose of EMTALA was not to guarantee that all patients are properly diagnosed, or even to ensure that they receive adequate care, but instead to provide an 'adequate first response to a medical crisis' for all patients and 'send a clear signal to the hospital community ... that all Americans, regardless of wealth or status, should know that a hospital will provide what services it can when they are truly in physical distress.' " *Baber v. Hospital Corp. of America*, 977 F.2d 872, 880 (4th Cir.1992) (quoting 131 Cong. Rec. S13904 (Oct. 23, 1985) (statement of Sen. Durenberger)). EMTALA does not create a federal cause of action for medical malpractice. *Correa*, 69 F.3d at 1193; *see also Reynolds*, 218 F.3d at 83 (quoting *Summers*, 91 F.3d at 1137 ("So far as we can tell, every court that has considered EMTALA has disclaimed any notion that it creates a general federal cause of action for medical malpractice in emergency rooms")).

■ "To establish an EMTALA violation, a plaintiff must show that (1) the hospital is a participating hospital, covered by EMTALA, that operates an emergency department (or an equivalent treatment facility); (2) the patient arrived at the facility seeking treatment; and (3) the hospital either (a) did not afford the patient an appropriate screening in order to determine if [he] had an emergency medical condition, or (b) bade farewell to the patient (whether by turning [him] away, dis-

charging [him], or improvidently transferring [him] ) without first stabilizing the emergency medical condition." *Correa*, 69 F.3d at 1190 (citations omitted). Defendants have not argued that Ryder is not a covered hospital nor have they argued that Martinez Lopez did not seek medical treatment. Rather, defendants have challenged the third element of plaintiffs' EMTALA claim, arguing that Martinez Lopez received an appropriate screening[1] and that he was never turned away from the hospital.

■ In regards to screening, plaintiffs assert that Martinez Lopez did not receive an appropriate medical screening, although they acknowledge that he received "some medical screening." The statute requires that a hospital provide "an appropriate medical screening examination within the capability of the hospital's emergency department" to anyone who "comes to" a hospital emergency department and requests treatment.[2] 42 U.S.C. § 1395dd(a). The screening must be done to determine if the patient suffers from an emergency medical condition as defined by the statute.[3] *Id.* "The essence of [EMTALA's] screening requirement is that there be some screening procedure, and that it be administered even-handedly." *Negron Agosto*, 299 F.3d at 19 (quoting *Correa*, 69 F.3d at 1192). Thus the screening contains both a substantive and procedural component. *Id.* "A hospital fulfills its stat-

---

1. Granted, the Court found this argument in one paragraph of defendant SIMED's motion for joinder, rather than in the principal brief submitted by Ryder. (Docket No. 188, p. 2, ¶ 4.)

2. Or on whose behalf a request for treatment was made by another. 42 U.S.C. § 1395dd(a).

3. Emergency medical condition is defined as "a medical condition manifesting itself by acute symptoms of sufficient severity (includ-

ing severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—

(i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,

(ii) serious impairment to bodily functions, or

(iii) serious dysfunction of any bodily organ or part[.]" 42 U.S.C. § 1395dd(e)(1)(A).

utory duty to screen patients in its emergency room if it provides for a screening examination reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients and provides that level of screening uniformly to all those who present substantially similar complaints." *Id.*

Plaintiffs fail to make any kind of threshold showing that the screening provided was not "reasonably calculated to identify critical medical conditions" or that the screening was not applied uniformly." Instead, plaintiffs' opposition only states in conclusory fashion that the screening provided was not reasonably calculated to identify his critical medical emergency. Plaintiffs did not support their conclusory allegations with more details nor did they assert what would have been an appropriate screening. Furthermore, they did not show what screening was provided to other similarly situated individuals. Moreover, in this case, as in *Reynolds,* there is a *prima facie* showing that Ryder satisfied the screening provision of EMTALA because Martinez Lopez was admitted to the hospital after visiting the ER. *See Reynolds,* 218 F.3d at 83 ("The fact that Mr. Reynolds was in the hospital receiving treatment is a prima facie showing that the purpose of subsection (a) was satisfied; any failures of diagnosis or treatment were then remediable under state medical malpractice law."). Therefore, plaintiffs' have not shown that defendants failed to provide an appropriate screening under EMTALA.

## 2. Stabilization

EMTALA requires covered hospitals to "stabilize" an individual if "the hospital determines that the individual has an emergency medical condition." 42 U.S.C. § 1395dd(b)(1). Stabilization requires the provision of "such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility[.]" 42 U.S.C. § 1395dd(e)(3)(A). Transfer, in turn, means the movement of an individual outside of the hospital (including discharge) at the direction of a hospital employee. 42 U.S.C. § 1395dd(e)(4). Thus, the stabilization requirement only applies to those individuals who, suffering from an emergency medical condition, were transferred (or discharged) away from the treating hospital. *Harry v. Marchant,* 291 F.3d 767, 775 (11th Cir.2002) ("There is no duty under EMTALA to provide stabilization treatment to a patient with an emergency medical condition who is not transferred."); *see Bryan v. Rectors & Visitors of the Univ. Of Virginia,* 95 F.3d 349, 352 (4th Cir.1996) ("The stabilization requirement is thus defined entirely in connection with a possible transfer and without any reference to the patient's long-term care within the system."); *Correa,* 69 F.3d at 1190 ("To establish an EMTALA violation, a plaintiff must show that ... the hospital bade farewell to the patient (whether by turning her away, discharging her, or improvidently transferring her) without first stabilizing the emergency medical condition."); *Estate of Felix Giomard Rivera v. Doctor Susoni Hosp.,* 288 F.Supp.2d 161, 165 (D.P.R.2003); *Torres Otero v. Hosp. General Menonita,* 115 F.Supp.2d 253, 260 (D.P.R.2000) ("the duty to stabilize exists not in a vacuum, but rather in reference to a transfer of the patient from the hospital") (citation omitted).

There is no allegation in this case that a hospital employee transferred Martinez Lopez outside of the hospital. In fact, the record reveals that Martinez Lopez did not leave the hospital once he was admitted to the ER. Accordingly, plaintiffs

have not established a "stabilization" claim under EMTALA.

### B. EMTALA Does Not Contain A Private Cause Of Action Against Physicians

 Plaintiffs bring their EMTALA claims not only against Ryder but also against individual physicians. Co-defendant SIMED argues that EMTALA does not provide a cause of action against physicians. SIMED is correct. The civil enforcement provision of EMTALA applies only to participating hospitals, not physicians. *See* 42 U.S.C. § 1395dd(d)(2)(A). This proposition finds abundant support in federal case law, although the First Circuit Court of Appeals has not pronounced itself on the issue. *See Eberhardt v. City of Los Angeles,* 62 F.3d 1253, 1256 (9th Cir.1995); *King v. Ahrens,* 16 F.3d 265, 271 (8th Cir.1994); *Delaney v. Cade,* 986 F.2d 387, 393–94 (10th Cir.1993); *Baber,* 977 F.2d at 878; *Gatewood v. Washington Healthcare Corp.,* 933 F.2d 1037, 1040 n. 1 (D.C.Cir. 1991); *Millan v. Hosp. San Pablo,* 389 F.Supp.2d 224, 235 (D.P.R.2005); *Lebron v. Ashford Presbyterian Comm. Hosp.,* 995 F.Supp. 241, 244 (D.P.R.1998); *see also Negron Agosto,* 299 F.3d at 19 ("we need not decide the question of physician liability in this case."). Accordingly, the lack of a cause of action against physicians provides an alternate basis for holding that plaintiffs have failed to state any claim under EMTALA against the physicians (or their insurers).

### C. Supplemental State Law Claims

Because no federal claim remains to ground jurisdiction in this case, plaintiffs' state law claims against defendants are dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

### IV. Conclusion

For the foregoing reasons, the court **GRANTS** defendants' motion for summary judgment. Plaintiffs' EMTALA claims against all parties are **dismissed with prejudice,** leaving no remaining federal claims. The supplemental state law claims are **dismissed without prejudice.** Judgment shall enter accordingly.

**IT IS SO ORDERED.**