# United States Court of Appeals
## For the First Circuit

No. 04-2375

EDGARDO JOSE CRUZ-QUEIPO; MARIA ISABEL PUIG-SANCHEZ; CONJUGAL
PARTNERSHIP CRUZ-PUIG,

Plaintiffs, Appellants,

v.

HOSPITAL ESPAÑOL AUXILIO MUTUO DE PUERTO RICO,

Defendant, Appellee;

AMERICAN INTERNATIONAL INSURANCE CO., a/k/a AIICO,

Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Jay A. García-Gregory, U.S. District Judge]

Before

Torruella, Lynch, and Lipez, Circuit Judges.

Rafael G. Martínez-Géigel, with whom Emilio E. Solé de la Paz
was on brief, for appellant.
Carlos E. Umpierre-Schuck, with whom Juan A. Pedrero-Lozada
was on brief, for appellee.

July 27, 2005

**LIPEZ, Circuit Judge**. This case tests the scope of hospital liability under the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd. EMTALA requires a hospital to even-handedly administer an appropriate screening procedure to all emergency room patients and, if it determines that an emergency medical condition exists, to stabilize the patient's condition before discharge or transfer to another hospital. See id. Asserting that Hospital Español Auxilio Mutuo de Puerto Rico (Auxilio Mutuo) did not comply with its own protocol in screening Edgardo Cruz-Queipo (Cruz) and that it failed to stabilize him prior to discharge, the plaintiffs appeal a grant of summary judgment against them. For the reasons set forth below, we vacate the district court's grant of summary judgment on both the screening and stabilization claims and remand for further proceedings.

## I.

In reviewing a grant of summary judgment, we view the record in the light most favorable to the nonmovant. See Del Carmen Guadalupe v. Negron Agosto, 299 F.3d 15, 17 (1st Cir. 2002). Accordingly, we draw the following facts from the summary judgment record, "indulging all reasonable inferences in [the plaintiffs'] favor." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990).

At approximately 4 p.m. on August 31, 2001, Cruz visited the Auxilio Mutuo emergency room complaining of pain in his chest,

-2-

arm, and wrist. Pursuant to Auxilio Mutuo's written policy, emergency room patients receive a screening examination upon arrival to determine the severity of their conditions and are then classified in one of four categories. Category I encompasses the most serious conditions, including acute chest pain with unstable vital signs, and Categories II, III, and IV encompass progressively less serious conditions. Triage officer Dr. Miguel Rodríguez performed an initial screening evaluation of Cruz pursuant to Auxilio Mutuo's policy. After checking Cruz's vital signs and noting that Cruz complained of pain in his left arm and warmth in his wrist, Dr. Rodríguez placed Cruz in Category IV, which includes back and muscle pain. Notes from the screening examination do not indicate that Cruz complained of chest pain. For purposes of summary judgment, however, we must credit Cruz's assertion that he did, in fact, report such pain, and, drawing all reasonable inferences in Cruz's favor, we must assume that the emergency room doctors were aware of the chest pain.

A second physician, Dr. James Davison, performed a more thorough examination of Cruz at approximately 5:30 p.m. Like Dr. Rodríguez, Dr. Davison did not document a complaint of chest pain. Finding that Cruz suffered from shoulder pain, however, Dr. Davison ordered an electrocardiogram (EKG) and a cervical spinal x-ray. He interpreted the results of both tests as negative. Based on his examination and the test results, Dr. Davison diagnosed Cruz with

thoracic outlet syndrome, a non-emergency disorder that involves the compression of blood vessels and nerves in the shoulder region. See National Institute of Neurological Disorders and Stroke, Thoracic Outlet Syndrome Information Page, at http://www.ninds.nih.gov/disorders/thoracic/thoracic.htm (last visited July 20, 2005). Dr. Davison prescribed Celebrex (an anti-inflammatory) and Clonazepan (an anti-convulsant) and discharged Cruz, encouraging him to follow up with a specialist.

The following day (September 1, 2001), Cruz returned to the Auxilio Mutuo emergency room with severe chest pain radiating to his left arm and jaw. Doctors determined that Cruz had suffered an acute myocardial infarction (heart attack). He was admitted to the coronary care unit, where he remained for approximately one week before being transferred to another hospital where he underwent sextuple bypass surgery. As a result of the infarction, Cruz suffered permanent damage to his heart, including scarring and decreased cardiac performance.

On October 2, 2002, the plaintiffs -- Cruz; his wife, Maria Isabel Puig-Sanchez; and their conjugal partnership -- filed a complaint against Auxilio Mutuo and American International Insurance Company,[1] charging violations of EMTALA. Specifically,

---

[1]American International Insurance Company was dismissed as a defendant on April 7, 2003 pursuant to an unopposed motion for summary judgment on the grounds that it "did not have in effect an insurance policy for Hospital Español Auxilio Mutuo covering the damages claimed in the complaint."

the plaintiffs asserted that Cruz had been suffering from acute coronary syndrome during his August 31 hospital visit and that hospital personnel failed to properly screen and stabilize him. The plaintiffs also contended that these deficiencies led to the permanent damage that Cruz suffered as a result of his heart attack on September 1.  After the close of discovery, Auxilio Mutuo filed a motion for summary judgment on the grounds that the plaintiffs failed to state a claim under EMTALA.  It argued that Cruz had been given an appropriate medical screening, that he was subjected to the same procedures used for every patient who visits the emergency room, that the August 31 visit did not implicate EMTALA's stabilization requirement because the hospital did not detect an emergency medical condition, and that there was no causal relationship between the damages alleged and the purported EMTALA violation.  Over the plaintiffs' vigorous objections, the district court granted Auxilio Mutuo's motion, finding that the plaintiffs' claims "are more suited to a medical malpractice claim."[2]  The plaintiffs appeal from this decision.

## II.

We review the grant of summary judgment de novo. Littlefield v. Acadia Ins. Co., 392 F.3d 1, 6 (1st Cir. 2004).  Summary judgment is appropriate where "the pleadings, depositions, answers

---

[2]The plaintiffs filed a separate malpractice suit in the Puerto Rico courts.

to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

## A.    The EMTALA statutory scheme

Congress enacted EMTALA in response to "the increasing number of reports that hospital emergency rooms are refusing to accept or treat patients with emergency conditions if the patient does not have medical insurance."  Correa v. Hosp. San Francisco, 69 F.3d 1184, 1189 (1st Cir. 1995) (internal quotation marks omitted).  EMTALA imposes two primary requirements on participating hospitals:[3]

> First, it requires that a participating hospital afford an appropriate medical screening to all persons who come to its emergency room seeking medical assistance. See 42 U.S.C. § 1395dd(a).  Second, it requires that, if an emergency medical condition exists, the participating hospital must render the services that are necessary to stabilize the patient's condition, see id. § 1395dd(b)(1)(A) . . . .

Id. at 1190.  As an enforcement mechanism for these requirements, EMTALA creates a private right of action for violations.  See  42 U.S.C. §§ 1395dd(d)(1), (2).

---

[3]EMTALA defines a participating hospital as a "hospital that has entered into a provider agreement under section 1395cc of this title."  42 U.S.C. § 1395dd(e)(2).  Neither side disputes that Auxilio Mutuo is a participating hospital.

**B.  EMTALA screening claim**

Although EMTALA does not define an "appropriate medical screening examination," our circuit law does:

> A hospital fulfills its statutory duty to screen patients in its emergency room if it provides for a screening examination reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients and provides that level of screening uniformly to all those who present substantially similar complaints.

Correa, 69 F.3d at 1192.  "The essence of this requirement is that there be some screening procedure, and that it be administered even-handedly."  Id.  When a hospital prescribes internal procedures for a screening examination, those internal procedures "set the parameters for an appropriate screening."  Id.[4]  A hospital thus must adhere to its own procedures in administering the screening examination.

The plaintiffs do not dispute that Cruz received a screening examination, nor do they contend that Auxilio Mutuo's screening protocol was per se inappropriate.  Rather, they argue that the hospital failed to follow its own protocol when it placed Cruz in

_____

[4]This is the view of other circuits as well.  See, e.g., Summers v. Baptist Med. Ctr. Arkadelphia, 91 F.3d 1132, 1138 (8th Cir. 1996) ("It is up to the hospital itself to determine what its screening procedures will be.  Having done so, it must apply them alike to all patients."); Baber v. Hosp. Corp. of Am., 977 F.2d 872, 878 & 879 n.7 (4th Cir. 1992) ("EMTALA only requires hospitals to apply their standard screening procedure for identification of an emergency medical condition uniformly to all patients.").

Category IV despite his complaint of chest pains that should have placed him in Category II (acute chest pain with stable vital signs), and that this departure from hospital protocol violated EMTALA's appropriate screening requirement.[5]  In short, they challenge the district court's conclusion that they "have no claim under EMTALA" because "Cruz was screened and evaluated according to Auxilio Mutuo protocol."  There is more to this challenge than may initially meet the eye.

In its brief, Auxilio Mutuo devotes a great deal of attention to the aspects of its triage protocol that were followed in this case.  It points out that Cruz was examined and placed in a triage category upon his appearance in the emergency room, and that he was subsequently evaluated by the emergency room physician.  Auxilio Mutuo asserts that Cruz's screening therefore did not deviate from the standard hospital protocol and that, at bottom, the plaintiffs' claim is really one of medical malpractice rather than of an EMTALA violation.  See id. at 1192-93 ("EMTALA does not create a cause of action for medical malpractice.  Therefore, a refusal to follow regular screening procedures in a particular instance contravenes the statute, but faulty screening, in a particular case, as opposed

_____

[5]Plaintiffs contend that Cruz should have been placed in either Category I or II, emphasizing that both categories include acute chest pain.  Category I, however, applies specifically to acute chest pain with unstable vital signs.  The triage officer determined that Cruz's vital signs were stable, and Cruz does not dispute that determination.  Therefore, he did not meet the requirements for Category I.

-8-

to disparate screening or refusing to screen at all, does not contravene the statute." (internal citations omitted)).

Auxilio Mutuo's reasoning overlooks one key factor -- namely, our inference, for purposes of summary judgment, that emergency room doctors were aware that Cruz was suffering from chest pain. Under Auxilio Mutuo's written triage policy, a patient with stable vital signs who complains of chest pain must be assigned to triage Category II. Indeed, the hospital conceded in its motion for summary judgment that, under its own standards, "[i]f the patient [had] referred a complaint of chest pains, he would have been placed in Category I or II with an emergency condition." Cruz's placement in Category IV despite a complaint of chest pains thus marked a departure from the hospital's standards, which "set the parameters for an appropriate screening." Id. at 1193; see also id. ("under EMTALA § 1395dd(a), the same screening examination must be made available to all similarly situated patients"). Accordingly, Auxilio Mutuo is not entitled to summary judgment on the plaintiffs' claim that Cruz was denied an appropriate screening in violation of EMTALA.

## C. EMTALA stabilization claim

The plaintiffs also assert a claim under EMTALA's stabilization requirement, which provides that

> [i]f any individual . . . comes to a hospital and the
> hospital determines that the individual has an emergency
> medical condition, the hospital must provide . . .

> (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition.

42 U.S.C. § 1395dd(b)(1)(A). The statute defines an emergency medical condition (for an individual not in active labor) as

> a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in (i) placing the health of the individual . . . in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part.

Id. § 1395dd(e)(1)(A).

In support of their stabilization claim, the plaintiffs point to Auxilio Mutuo's acknowledgment, in its motion for summary judgment, that "[i]f the patient [had] referred a complaint of chest pains, he would have [had] . . . an emergency condition, [and] therefore the hospital [would have been] obliged to stabilize the patient." Emphasizing this concession, the plaintiffs assert that if we accept that Cruz complained of chest pains during his August 31 visit, we must also conclude that the hospital had a duty to stabilize the heart condition that culminated in a heart attack on September 1. We agree.

At this stage of the proceedings, as we have already explained, we must draw the inference that the hospital knew that Cruz was suffering from chest pain. By its own admission, then, the hospital also knew that Cruz was suffering from an emergency

-10-

medical condition and had a duty to stabilize that condition. Auxilio Mutuo therefore was not entitled to summary judgment on the plaintiffs' stabilization claim.[6]

### III.

Although a jury ultimately may determine that the hospital's treatment of Cruz did not violate EMTALA, the summary judgment record, viewed in the light most favorable to the plaintiffs, does not permit that conclusion as a matter of law. In light of Cruz's claim that he complained of chest pain during his August 31 visit to the emergency room and the hospital's concession regarding its own standards for handling such a complaint, we must **vacate** the grant of summary judgment to Auxilio Mutuo and **remand** to the

---

[6]Auxilio Mutuo also asserts that it is entitled to summary judgment on the ground that "there is no causal relation[ship] between the damages alleged and the purported EMTALA violation." See 42 U.S.C. § 1395dd(d)(2)(A) ("Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of [EMTALA] may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located . . . ."); 31 P.R. Laws Ann. § 5141 (damages available under Puerto Rico law when "[a] person who by an act or omission causes damage to another through fault or negligence" (emphasis added)). Specifically, Auxilio Mutuo claims that Cruz's heart condition was attributable to his "inability to adequately care for his physical condition" by controlling his cholesterol and blood pressure, rather than to any action or omission of the hospital. This argument is a non-starter. Hospitals generally do not cause the emergency conditions that they are called upon to stabilize under EMTALA. That does not mean, however, that a hospital's failure to stabilize a condition bears no causal relationship to the damages suffered by a patient as a result of a deterioration in his condition that could have been avoided by stabilization.

district court for further proceedings consistent with this opinion.

**So ordered.**