**Yolanda ISAAC–BURGOS, et al., Plaintiffs**

v.

**Dr. Gilberto RODRIGUEZ, et al., Defendants.**

**Civil No. 06–1259 (JP).**

United States District Court, D. Puerto Rico.

May 2, 2007.

Pedro F. Soler–Muñiz, Esq., Centro Internacional de Mercadeo, Guaynabo, PR, Wanda I. Medina-de Soler, Esq., Caparra Heights, San Juan, PR, for Plaintiffs.

Roberto E. Ruiz–Comas, Esq., González Villamil Law Office, San Juan, PR, for codefendant Dr. Gilberto Rodríguez and the C/P Rodríguez–Doe.

Jaime E. Morales–Morales, Esq., Milagros del Carmen López–Pérez, Esq., Morales Morales Law Offices, San Juan, PR, for codefendant Dr. Mario Acosta–Duarte and the C/P Acosta–Doe.

Ruy V. Díaz–Díaz, Esq., Arroyo Monrouzeau CSP, San Juan, PR, for codefendant Hospital Auxilio Mutuo de P.R., Inc.

José E. Soler–Ochoa, Esq., SIMED, San Juan, PR, for codefendant SIMED as insurer for Dr. Gilberto Rodríguez and Dr. Mario Acosta.

## OPINION AND ORDER

PIERAS, Senior District Judge.

The plaintiffs filed the instant case against a hospital and two doctors claiming medical malpractice and that the hospital violated the Emergency Medical Treatment and Active Labor Act (EMTALA). The defendants move for summary judgment dismissing the EMTALA claims with prejudice. The defendants' motions **(Nos.63, 68, 73)** are **DENIED**.

## I. STANDARD

Summary judgment serves to assess the proof to determine if there is a genuine need for trial. *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990). Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appro-

priate when "the record, including the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, viewed in the light most favorable to the nonmoving party, reveals no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Zambrana–Marrero v. Suárez–Cruz,* 172 F.3d 122, 125 (1st Cir.1999) (stating that summary judgment is appropriate when, after evaluating the record in the light most favorable to the non-moving party, the evidence "fails to yield a trial worthy issue as to some material fact"); *Goldman v. First Nat'l Bank of Boston,* 985 F.2d 1113, 1116 (1st Cir.1993); *Canal Ins. Co. v. Benner,* 980 F.2d 23, 25 (1st Cir.1992). The Supreme Court has stated that "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In this way, a fact is material if, based on the substantive law at issue, it might affect the outcome of the case. *See Mack v. Great Atl. and Pac. Tea Co., Inc.,* 871 F.2d 179, 181 (1st Cir.1989).

In a summary judgment motion, the movant bears the burden of "informing the district court of the basis for its motion and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once the movant meets this burden, the burden shifts to the opposing party who may not rest upon mere allegations or denials of the pleadings, but must affirmatively show, through the filing of supporting affidavits or otherwise, that there is a genuine issue of material fact for

trial. *See Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Goldman,* 985 F.2d at 1116.

## II. MATERIAL FACTS NOT IN GENUINE ISSUE OR DISPUTE

The parties stipulated to the following facts at the Initial Scheduling Conference held on August 28, 2006.

1. Dr. Mario Acosta–Duarte is a physician licensed to practice medicine in Puerto Rico.

2. At all time relevant Dr. Acosta had privileges extended by Hospital Auxilio Mutuo de Puerto Rico, Inc. ("HAM").

3. Dr. Gilberto Rodríguez is a physician with a specialty in the field of internal medicine, and is authorized to practice medicine in Puerto Rico. At all times relevant he had medical privileges extended by HAM. He is married to Ana Rivera.

4. The plaintiffs are not entitled to hedonic damages under Puerto Rico law.

5. On March 8, 2002 Alfonso Domenech was admitted to HAM's Emergency Room due to a transient ischemic attack (TIA).

6. On March 13, 2004 Alfonso Domenech, a 64–year–old male, was taken to the Emergency Room of HAM.

7. The medical records contain no information as to what time Domenech arrived at HAM's emergency room on March 13, 2004.

8. It was noted that Domenech arrived at the HAM by stretcher.

9. Domenech was triaged at the HAM on March 13, 2004 at 1:43 p.m.

10. At the time of the triage Domenech's blood pressure was 184/94, temperature 37, heart rate 86, and respirations 18. His complaints were hypoactivity, dehydration, and generalized weakness. On a pain scale of 0–10, 10 being the worst pain

possible, the nurse assessed Domenech's pain at 7. Domenech was classified as a "category 3" patient.

11. Domenech was evaluated at the emergency room by Dr. Acosta.

12. Dr. Acosta placed a verbal communication to Dr. Gilberto Rodríguez at 3:15 p.m. on March 13, 2004.

13. Domenech had a history of high blood pressure, a history of a previous brain infarct or CVA (cerebral vascular accident), and a recent fall. This history was known by the defendants by the time he was evaluated by Drs. Acosta and Rodríguez. Domenech also had a history of new prostate cancer.

14. HAM's triage categories are from 1 to 4, with 1 the emergency cases, and 4 the least urgent cases.

15. HAM's triage protocol category defines, among others, that a patient with acute chest pain and unstable vital signs is a "category 1" patient.

16. HAM's triage protocol category defines, among others, that a patient with suspicion of brain aneurism or other vascular area is a "category 1" patient.

17. HAM's triage protocol category defines, among others, that a patient with neurologic deficit of acute onset is a "category 1" patient.

18. HAM's triage protocol category defines, among others, that a patient with moderate to severe dehydration is a "category 2" patient.

19. On March 13, 2004 Dr. Acosta ordered the following tests: CBC with differential, enzymes profile, cardiac profile, arterial blood gases, chest X-ray, brain CT scan. The orders were taken by the hospital nurse at 7:50 p.m.

20. An electrocardiogram (EKG) was performed on March 13, 2004 at 8:20 p.m. The printout results from the EKG stated "Abnormal EKG," "nonspecific diffuse ST–T abnormalities," "consider anteroseptal infarct," and "Preliminary–MD must review." The EKG printout results were evaluated by Dr. Rodríguez.

21. An arterial blood gas result performed on March 13, 2004 at 9:00 p.m. reflected the patient's PO2 at 81 mmHg, and oxygenation levels at 96 percent.

22. The results of the cardiac profile ordered by Dr. Acosta Duarte reflected a CPK enzyme of 911, and CKMB of 3. The result was verified by the lab on March 13, 2004 at 9:07 p.m. The result was known by Dr. Rodríguez before Domenech was discharged.

23. Domenech was not admitted to the hospital and remained at the emergency room from his arrival until his discharge.

24. On the morning of March 14, 2004 Domenech was discharged from HAM's emergency room.

25. The order of discharge was issued by Dr. Rodríguez.

26. Domenech died on March 16, 2004.

The following material facts are properly supported, and are not in genuine issue or dispute. The Court here exercises its authority under Rule 56(d) to designate these facts as established in this case.

27. Domenech was examined at the triage area.

28. On the triage evaluation there are recorded several events pertaining to Domenech such as his blood pressure, temperature, respiration rate, heart rate weight, his mode of arrival, the patient's chief complaint, medications taken, allergies, past medical history, pain, and whether he had pain in the past days or weeks.

29. At the triage level of Emergency Room of Auxilio Mutuo there are four different categories to establish a pri-

ority system for patient care. The classification system gives priority to the most severe conditions to ensure immediate and appropriate treatment.

30. "Category 3" includes, among others, chest pain (non-cardiac, associated with cold symptoms), slight dehydration for any reason, hypertension not complicated, and headache not complicated.

31. On March 13, 2004 at approximately 2:45 p.m., Domenech was examined by Dr. Mario Acosta–Duarte.

32. In the history taken and the assessment of Domenech's condition, Dr. Acosta noted the following:

Chief Complaint: Hypoactivity, dehydration, weakness. Current Medications: Hyzaar. Patient male, 64 years old with history of prostate cancer. CVA two years ago. High blood pressure.

Today shows hypoactivity, can't walk without help, no history of fever, but has some history of fall down four days ago.

General Appearance: bed ridden, hypoactive, somnolent, follows orders but falls sleep again. Lungs are clear as auscultation. Heart regular rate, no murmur.

Neurologic: sleepy but moves the four extremities.

Labs ordered: CBC with differential, emergency profile, cardiac profile, arterial blood gases, chest x-ray; brain CT; normal saline solution to keep vein open.

Diagnosis: Hypoactivity rule out CVA. Prostate carcinoma. High blood pressure.

33. Later that date, after verbal request by Dr. Acosta–Duarte, Domenech was examined by Dr. Gilberto Rodríguez–Rodríguez, an internal medicine specialist. Dr. Rodríguez's consultation note dated March 13, 2004 at 3:45 p.m. states:

Male 64 years old with history of prostate cancer, high blood pressure, treatment Hyzaar, CVA two years ago without residual deficit. Came because of hypoactivity, cough scanty sputum, low grade fever. Refer history fell down days ago. Negative dysuria, focal deficit.

Physical examination: 170/80 (blood pressure), 20 (respirations), 37 (temperature). Thorax symmetrical, no use ... lungs are clear at regular rhythm, abdomen soft, pressurable, bowel positive, extremities no edema; CT Scan of the brain done.

Assessment: Rule Out respiratory tract infection, high blood pressure, prostate cancer.

34. As a result of such evaluation on a note written by Dr. Rodríguez at 7:50 p.m. on March 13, 2004, he placed several medical orders for the patient. The orders were: to administer .45% of saline solution 1000 cc every 8 hours; CBC (complete blood count) with differentials, SMA 7, arterial blood gases, electrocardiogram, urinalysis, chest x-ray, administration of rocephin (an antibiotic), and oxygen 3 liters.

35. When the patient was taken to Auxilio Mutuo he was evaluated and multiple studies were done.

36. The specific enzyme test to determine if a patient is undergoing a heart problem is known as the CPKMB. To rule out heart disease the test needed is a CPKMB.

37. If the patient started to suffer a heart problem prior to arriving to the hospital, it would be possible that when the enzyme test was done an

abnormality would have been found on the CPKMB.

38. Yolanda Isaac–Burgos noticed that her husband was complaining of chest pain during the morning of March 13, 2004. On that same morning she made arrangements to take Domenech to HAM via ambulance. The ambulance arrived to pick up Domenech at around 11:00 a.m.

39. After the onset of symptoms, CPK values are expected to rise after six to eight hours.

40. On March 13, 2004 at 9:00 p.m. the Arterial Blood Gas analysis was reported.

41. The progress note on the morning of March 14, 2004 written by Dr. Rodríguez states the following:

Physical examination: Unremarkable. Feel better. Chest x-ray negative. Brain Ct. negative. Electrocardiogram normal sinus rhythm. CK above 900. No focal neurologic deficit.

Diagnosis: Acute bronchitis.

CK (CTBD) [Cause to be determined]

Plan: Follow up CK and work-up.

Tequin

Tussar

42. When Domenech arrived at the hospital he was given IV fluids for hydration.

43. On March 14, 2004 at 8:00 a.m. Dr. Rodríguez ordered the patient's discharge home.

## III. ANALYSIS

■ Congress enacted EMTALA in response to "the increasing number of reports that hospital emergency rooms are refusing to accept or treat patients with emergency conditions if the patient does not have medical insurance." *Cruz–Queipo v. Hospital Espanol Auxilio Mutuo de P.R.*, 417 F.3d 67, 69 (1st Cir.2005). To

establish an EMTALA violation, a plaintiff must show that (1) the hospital is a participating hospital covered by EMTALA that operates an emergency department or equivalent treatment facility; (2) the patient arrived at the facility seeking treatment; and (3) the hospital either (a) did not afford the patient an appropriate screening in order to determine if he had an emergency medical condition, or (b) bade farewell to the patient (whether by turning him away, discharging him, or improvidently transferring him) without first stabilizing the emergency medical condition. *Correa v. Hospital San Francisco*, 69 F.3d 1184, 1190 (1st Cir.1995). The defendants argue they are entitled to summary judgment, because there is no genuine issue as to whether HAM appropriately screened Domenech or discharged him without first stabilizing emergency medical conditions. The Court disagrees.

### A. EMTALA Screening Claim

■ The First Circuit defines the screening required under EMTALA as follows:

A hospital fulfills its statutory duty to screen patients in its emergency room if it provides for a screening examination reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients and provides that level of screening uniformly to all those who present substantially similar complaints.

*Cruz–Queipo*, 417 F.3d at 70; *Correa*, 69 F.3d at 1192. When a hospital prescribes internal procedures for a screening examination, those internal procedures set the parameters for an appropriate screening, and the hospital must adhere to its own procedures in administering the screening examination. *Cruz–Queipo*, 417 F.3d at 70.

HAM is not entitled to summary judgment on the plaintiffs' EMTALA screening claims, because there is a genuine issue as to whether HAM followed its own established procedures when it screened Domenech. The parties agree that Domenech was triaged at 1:43 p.m. on the day of his arrival at HAM's emergency department. Although the only reference to chest pain complaints in Domenech's medical record of his March 13, 2004 visit to HAM appears in interpretations of lab results, the plaintiffs produced their affidavits in which they affirmed that Domenech's wife, plaintiff Yolanda Isaac–Burgos, told the screener, Dr. Acosta, and Dr. Rodríguez that Domenech had chest pain, and had suffered a transient ischemic attack two years before. Therefore the Court must draw the inference that HAM knew Domenech was suffering from chest pain. The parties agree that a patient with acute chest pain and unstable vital signs is a "category 1" patient. The plaintiffs demonstrated that if HAM had classified Domenech as a "category 1" patient, rather than as a "category 3" patient, he would have been placed on the "chest pain protocol," and tests to rule out heart disease would have been repeated. The plaintiffs also raised an issue as to whether HAM violated its policies regarding the triage screener's qualifications. HAM's emergency department manual provides that triage screening must be performed by a registered nurse or a "physician." Domenech was screened by Charles Balbuena, who attended a foreign medical school, but was not licensed to perform medicine in Puerto Rico. As the non-movants, the plaintiffs are entitled to the reasonable inference that HAM's policy requires screening to be performed by either a registered nurse or "physician," licensed as such in Puerto Rico. Because there are genuine issues as to whether HAM followed its own screening procedures, the defendants are not entitled to summary judgment on the plaintiffs' EMTALA screening claims.

### B. EMTALA Stabilization Claim

In addition to a medical screening requirement, EMTALA mandates that hospitals stabilize patients with emergency medical conditions before releasing them. *See* 42 U.S.C. § 1395dd (b). A hospital's duty to stabilize a patient's condition only arises if the hospital determines that the patient has an emergency medical condition. *del Carmen Guadalupe v. Negron Agosto*, 299 F.3d 15, 23 (1st Cir.2002). HAM ordered Domenech's discharge at 8:00 a.m. on March 14, 2004. As stated above, the Court must draw the inference that HAM knew Domenech was suffering from chest pain, and must also infer that HAM had the obligation to stabilize the medical condition causing the chest pain. Although HAM performed tests, there is no indication on the record that HAM treated Domenech's chest pain or underlying heart condition. Also, the plaintiffs produced evidence that when Domenech left HAM he was urinating uncontrollably, disoriented, and "could hardly walk." HAM does not argue that such symptoms do not indicate an emergency medical condition which HAM was obligated to stabilize under EMTALA. Accordingly the Court denies HAM summary judgment on the plaintiffs' EMTALA stabilization claims.

### IV. CONCLUSION

The defendants are denied summary judgment on the plaintiffs' EMTALA screening and stabilization claims.

**IT IS SO ORDERED.**